[Nos. 63241-8-I; 63709-6-I. Division One. July 16, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. CURTIS SHANE THOMPSON, *Appellant*.

442

*David L. Donnan* and *Susan F. Wilk* (of *Washington Appellate Project*), for appellant

*Daniel T. Satterberg, Prosecuting Attorney*, and *Ann M. Summers* and *Deborah A. Dwyer, Deputies*, for respondent.

¶1 ELLINGTON, J. — In three separate, notorious trials, Curtis Thompson was convicted of numerous charges stemming from a series of violent crimes in 2004. He contends his convictions should be reversed because the court refused his requests for substitute counsel or pro se status, thus violating his constitutional rights to conflict-free counsel and self-representation. But any conflicts between Thompson and his attorney were entirely of Thompson's deliberate making and did not interfere with counsel's effective representation. Thompson's initial requests to represent himself were equivocal and plainly intended to delay or obstruct the administration of justice. By the time

his requests became arguably unequivocal, Thompson had waived the right to represent himself by his violently disruptive behavior, which was both constant and deliberate. Thompson raises many other issues in this appeal, both through counsel and pro se. Finding none persuasive, we affirm in all respects.

## CHARGES

¶2 In 1985, Curtis Thompson was convicted of raping four women. He served 18 years in prison. The State petitioned to commit him as a sexually violent predator. Thompson testified, taking full responsibility for the 1985 rapes. A jury found the State had not met its burden for civil commitment, and Thompson was released in 2003. Ten months later, Thompson engaged in the series of violent crimes that are the subject of this appeal.

¶3 First, Thompson was arrested on August 23, 2004, and charged with burglary in the first degree, robbery in the second degree, two counts of assault in the first degree with sexual motivation, attempted indecent liberties, three counts of unlawful imprisonment with sexual motivation, and attempt to disarm a police officer. These charges arose from Thompson's conduct in accosting Lisa R., Megan K., and Richard B.[1] The information alleged that Thompson approached the two women outside Lisa's apartment building. He punched Lisa in the face, grabbed her purse, and chased both women into an elevator, where he ordered Megan to remove her shirt and bra, took Lisa's wedding ring and other property, and threatened both with further physical harm. When Richard attempted to come to their aid, Thompson punched him in the head and held him in the elevator. Later, in his attempt to escape, Thompson assaulted two police officers and attempted to take one officer's weapon. He was taken into custody.

---

[1] We later use the victims' first names to protect their privacy. No disrespect is intended.

¶4 The State later amended the information to charge Thompson with the earlier rape of Bernadette M., which occurred August 17, 2004. The information alleged that Thompson entered her home through a window, repeatedly raped her, rubbed bleach onto her body in an apparent attempt to obliterate evidence, and took her car. He was charged with burglary in the first degree, rape in the first degree, and taking a motor vehicle without permission.

¶5 In a separate information, the State charged Thompson with murder in the first degree in the death of Deborah B., whose DNA (deoxyribonucleic acid) was found on the pants Thompson was wearing when he was arrested on August 23 and whose body was found on August 26. The State pursued alternative theories of intentional murder and felony murder predicated on rape in the first or second degree or burglary in the first degree.

¶6 Each incident was separately tried. The juries found Thompson guilty of all charges except attempted disarming of a police officer. The jury found that the burglary and unlawful imprisonment in the first case and the murder in the third case were committed with sexual motivation.

¶7 Thompson's convictions resulted in five life sentences without the possibility of parole, plus several lesser terms.

## I. ISSUES COMMON TO ALL TRIALS

¶8 Thompson raises numerous issues common to all three trials. These include his claims that the court violated his right to conflict-free counsel by denying his motions for substitute counsel, violated his right to self-representation by refusing his requests for pro se status, and violated his right to due process by requiring him to appear before the jury in restraints.[2] To address these claims, it is necessary to set out the record in some detail.

---

[2] Thompson also challenges admission of ER 404(b) evidence of his prior crimes in two trials. Because this issue must be analyzed in light of specific charges, we address it in our discussions of each trial despite the repetition that results.

¶9 Attorneys Richard Warner and Mark Adair had successfully defended Thompson in the sexually violent predator proceedings. They were appointed to defend him on the new charges. Despite their previous good relationship, Thompson soon demanded to have them removed. In April 2005, Thompson was scheduled to present a motion before Judge Ronald Kessler, seeking to discharge Warner and Adair and appear pro se. Before he could be brought into the courtroom, however, Thompson became violent and physically attacked the jail officers. He was subdued and returned to his cell in a restraint chair.

¶10 Thompson renewed his motion to discharge Warner and Adair in August and October 2005. In October, he asked to have new counsel appointed. Judge Kessler denied both motions.

¶11 In March 2006, Thompson again moved to replace Warner and Adair and sought appointment of private counsel because "there's a conspiracy between the public defender's office and the King County prosecutor's office."[3] He did not want to represent himself: "[T]he only alternative is, is going pro se. And I do not feel I am qualified to do that."[4] Warner and Adair supported the motion, stating that because Thompson would not allow them to attend his ongoing competency evaluation, they would be unable to provide him with effective representation.

¶12 Judge Kessler asked Thompson whether he would refuse to cooperate with any attorney. Thompson agreed that was possible. Nevertheless, in an effort to move forward, Judge Kessler granted Thompson's motion and allowed Warner and Adair to withdraw. On March 8, 2006, John Hicks was appointed as counsel. Judge Kessler specifically instructed Thompson that he would not entertain a future motion to discharge Hicks in favor of new counsel.

---

[3] Report of Proceedings (RP) (Mar. 1, 2006) at 5.

[4] *Id.*

¶13 By September 2007, however, the relationship between Thompson and Hicks had become acrimonious, and both Hicks and Thompson sought intervention from the court. Thompson requested numerous forms of relief, including appointment as co-counsel with Hicks. Judge Helen Halpert held an ex parte hearing to explore these concerns.

¶14 The chief issue was a disagreement over trial strategy. Thompson wanted to pursue a mental defense, but after investigation and consultation with experts, Hicks had concluded that no mental defense was available. Judge Halpert agreed with Hicks about the infirmity of such a defense and reminded Thompson that decisions about trial strategy are for counsel to make. She declined to replace Hicks and observed that given Thompson's "inability to work with one set of very experienced lawyers, I don't believe the situation would be any different" if Hicks were replaced.[5]

¶15 In September and October, Thompson filed several pro se motions, seeking new counsel. At a hearing before Judge Gregory P. Canova on October 8, 2007, Thompson complained about Hicks' representation and insisted he be removed, suggesting he would even prefer to proceed pro se than with Hicks as counsel. But he explained, "I do not want to proceed pro se because I cannot investigate like this, and I cannot present my defense like this, so I need at least an investigator or experts to work with me."[6]

¶16 Thompson and Hicks were still struggling with their disagreement about Thompson's defense. Hicks informed the court Thompson would no longer speak to him and had threatened to kill him if he tried to visit. Hicks also reported that Thompson "has indicated if I proceed with my representation without his desired defense, he will stop the

---

[5] RP (Sept. 14, 2007) at 15-16.

[6] RP (Oct. 8, 2007) at 10.

proceedings any way he can."[7] Hicks believed he had a duty to withdraw.

¶17 Like Judge Halpert, Judge Canova agreed with Hicks' assessment of Thompson's desired mental defense. He explained to Thompson that no lawyer would be able to advance such a defense without supporting testimony from an expert and denied the motion for new counsel. Thompson then moved to proceed pro se.

¶18 When the court took up Thompson's motion to represent himself, Thompson became disruptive. Judge Canova warned Thompson that his behavior was "one of the major considerations in deciding whether or not to allow you to proceed pro se."[8] Thompson's behavior did not improve, to the point that he was removed from the courtroom. Hicks noted for the record that Thompson threatened him on his way out, but that he (Hicks) did not anticipate it would ever "become relevant."[9] The court denied both Thompson's motion for pro se status and Hicks' motion to withdraw.

¶19 One week later, with the first trial only 10 days away, Hicks supplemented his motion to withdraw. He explained, "I don't mind threats so much; I have been threatened many, many times in my career."[10] Rather, Hicks believed he could not provide effective assistance because Thompson would not listen to his advice. Hicks candidly acknowledged, however, that "even if another attorney is put in the same situation, it probably would involve the same table turning, table up-ending acrimony I foresee at trial, if in fact I proceed as his lawyer."[11] Finding no reason to change his ruling, Judge Canova again denied Hicks' motion to withdraw.

---

[7] *Id.* at 19.

[8] *Id.* at 24.

[9] *Id.* at 27.

[10] RP (Oct. 15, 2007) at 29.

[11] *Id.* at 29-30.

¶20 The court then addressed Thompson's pro se motion seeking new counsel or, alternatively, to proceed pro se with standby counsel. Thompson stated his principal desire was to have new counsel appointed, but if that request were denied, he would be "forced" to represent himself.[12] Thompson asked rhetorically, "Now is that intelligently, knowingly and voluntarily? No."[13]

¶21 The court nevertheless conducted a colloquy to evaluate Thompson's request and concluded Thompson had not waived his right to counsel.[14]

¶22 Thompson then threatened to kill Hicks and his "cronies, including . . . any justices, cops, whoever, any of these idiots that work for these idiots in this corrupt system."[15] He was removed from the courtroom.

¶23 Hicks renewed his motion to withdraw, not because of Thompson's threats of violence but because "[t]here is just no way I can communicate with the man. There is no way I can guide him. In fact, he gets worse the more I try to convince him that his position is simply erroneous, as well as my own efforts to prepare his case."[16] Hicks was further concerned that "a jury is . . . going to see me unable to articulate what I want to articulate and do what I want to do, because he won't communicate with me, and they are going to see that."[17]

¶24 The court acknowledged Hicks' concerns but denied his motion to withdraw. "The reality is, as I noted to Mr. Thompson, . . . I have no belief that any other counsel, any other competent counsel, let me put it that way, would have

---

[12] *Id.* at 31.

[13] *Id.* at 43.

[14] The court ruled, "At this point I cannot find that you are making a knowing, intelligent and voluntary waiver of your right to be represented." *Id.* at 73.

[15] *Id.* at 77.

[16] *Id.* at 81.

[17] *Id.*

any better luck with Mr. Thompson than you have had, or his prior counsel have had," because any attorney would give the same advice Hicks had given, and "Mr. Thompson is going to develop the same kind of relationship with that new counsel that he has unfortunately developed with you."[18] Hicks soldiered on.

¶25 In a November 5, 2007 status conference before Judge Nicole MacInnes, Thompson renewed his motion to remove Hicks and represent himself. Judge MacInnes denied the request as not constituting an unequivocal, knowing, and voluntary waiver of the right to counsel.

¶26 On January 18, 2008, the issue arose again. Thompson was hostile and threatening toward the court and others in the courtroom, persistently interrupted and yelled at the court, the prosecutor, and Hicks, and threatened to kill Hicks. Judge MacInnes reserved ruling.

¶27 On February 15, 2008, Judge MacInnes attempted to conduct a colloquy to evaluate Thompson's request to represent himself. He was again threatening toward the court and others, constantly interrupted Judge MacInnes, and yelled at the court and counsel. The prosecutor described his demeanor as "extremely belligerent" and "menacing" toward the court.[19] Despite several warnings, Thompson's obstructive behavior prevented the court from conducting the pro se colloquy. Thompson was again removed from the courtroom.

¶28 On February 28, 2008, the court again tried to address the issue. Hicks told Thompson that if he would "allow the judge to just ask you the questions she's required to ask, she'll probably grant your motion to go pro se."[20] Heedless of this advice, Thompson continued to interrupt and argue with the court. Judge MacInnes observed that

---

[18] *Id.* at 82.

[19] RP (Feb. 15, 2008) at 17-18.

[20] RP (Feb. 28, 2008) at 15.

every hearing was characterized by "Mr. Thompson determining that he will not answer the court's questions, that he will dictate what is being said, that he will make very inappropriate—and as I say, that is probably the least descriptive word—completely inappropriate comments to certainly his counsel and to the court and has given consistently no indication that Mr. Thompson would abide by the court rules, abide by those policies and procedures related to the orderly process of a trial."[21]

¶29 Noting Thompson's "consistently and constantly disruptive" behavior, the court found there is "no conceivable scenario" under which trial could proceed with Mr. Thompson representing himself.[22] Thompson's reaction to this ruling resulted in his removal from the courtroom.

¶30 In March 2008, Hicks became concerned that Thompson's behavior was increasingly bizarre and asked for another competency evaluation. Judge MacInnes agreed to authorize an evaluation "in the interests of caution" but warned Thompson that "a continued unwillingness to talk to Mr. Hicks and to be hostile to him as a defense attorney will not result in your being found incompetent to stand trial."[23] Thompson responded, "Your Honor, I have a problem with the whole judicial system for the last 25 years. It is not just this individual. It is the whole system. Don't you realize that?"[24]

¶31 The case was transferred to Judge Palmer Robinson. Based upon the evaluation from Western State Hospital, she found Thompson competent to stand trial.

¶32 When Thompson raised allegations of discovery violations, Judge Robinson set a hearing to address his concerns. The discovery issue was not resolved to Thompson's

---

[21] *Id.* at 16.

[22] *Id.* at 18-19.

[23] RP (Mar. 13, 2008) at 4, 9.

[24] *Id.* at 10.

satisfaction, and he repeatedly interrupted the court despite several admonitions. He wanted Judge Robinson to recuse herself and to address several written pro se motions, including a motion for substitute counsel, and again moved for pro se status.

¶33 Judge Robinson had informed herself on the history of the issue and had listened to recordings of many of the hearings. She denied the motion for substitute counsel: "Any issue between you and Mr. Hicks is your failure to cooperate with him and your insistence on his pursuing theories which are not supportable legally or factually, and is an issue which would be revisited with any other attorney whom I or the Office of Public Defense appoint to represent you. That motion's denied."[25] This prompted another outburst by Thompson: "Bitch. Bitch. I will never come before you again, bitch. You're prejudicial too."[26]

¶34 At a later hearing, Thompson renewed his request to represent himself "if I can't disqualify [Hicks]."[27] Judge Robinson again reviewed in detail what had transpired at previous hearings. She observed that Thompson's requests had "certainly been equivocal" but that his recent correspondence "is not so equivocal."[28] She noted that the right to self-representation may be waived by conduct and asked Thompson whether he was "able to commit that you're not going to engage in the kind of conduct which you have done historically through these cases?"[29] Thompson pledged that his conflict was with counsel and that if Hicks were removed, "there will be no conflict no more."[30] Thompson raised the same issues discussed in other hearings about access to discovery and trial strategy, explaining his wish to

---

[25] RP (June 27, 2008) at 10.

[26] *Id.*

[27] RP (July 11, 2008) at 3.

[28] *Id.* at 4.

[29] *Id.* at 5.

[30] *Id.*

proceed pro se only in terms of his dissatisfaction with Hicks. After this colloquy, the court concluded that "even this morning Mr. Thompson . . . is not saying he wants to represent himself. He's saying he wants a different lawyer."[31] Judge Robinson found that the same issues would arise again with any attorney. Thompson responded, "[U]ntil I get an attorney that's willing to investigate the prosecut[or]'s office, there is a complete conflict of interest."[32]

¶35 The court warned Thompson that he was "perilously close" to waiving his right to be present or to represent himself.[33] "[I]f this were a courtroom with a video, it would record your body language, which is another reason that I would find that you are waiving your right to represent yourself. You are very close to having me ask the officers to remove you."[34] Thompson continued to act out and was removed from the courtroom. Judge Robinson found that Thompson's conduct "waived his right to make the pro se argument and to go pro se."[35]

¶36 The next hearing was scheduled to address courtroom security issues. But Thompson had other ideas. After purporting to change his plea to not guilty by reason of insanity, he demanded a ruling on his discovery motions. Judge Robinson indicated the motions had already been denied. Thompson erupted, "I'm not going to let you speak because all you have to say is bullshit. . . . Don't have me brought before your presence again, okay. We're through, bitch. Don't – I don't want to see you again."[36]

---

[31] *Id.* at 9.

[32] *Id.* at 11.

[33] *Id.*

[34] *Id.* at 12.

[35] *Id.* at 15.

[36] RP (July 24, 2008) at 37.

¶37 The court found Thompson had waived his right to be present at the hearing and said she was "prepared to find this is intentional and deliberate."[37]

¶38 Thompson refused to attend the next scheduled hearing.

¶39 At the next, he was immediately belligerent. Judge Robinson asked whether he was planning to "continue to be disruptive and speak out of turn and threaten people."[38] Thompson replied, "Yeah. If my constitutional rights are continually violated, yes, I am."[39] Judge Robinson tried to explain that his behavior could result in waiver of his right to be present, saying that he could remain in the courtroom if he was "able and willing to comport yourself in a way that is not disruptive."[40] Thompson responded, "It won't happen, Your Honor. It will not happen, okay. That's why I'm [not guilty by reason of insanity]."[41] Thompson was removed from the courtroom once again. Judge Robinson found that his efforts to change his plea were "purely for a delay" and were part of "a continuing effort to be sort of obstreperous, is a nice way of putting it."[42]

¶40 Concerned about the possibility that Thompson's behavior would eventually result in a waiver of his right to be present during trial, and that Thompson might therefore have to observe proceedings by video from another location, Hicks asked the court to appoint liaison counsel to relay messages to and from Thompson. The court appointed Philip Tavel.

¶41 Before each trial, Thompson renewed his motion to proceed pro se, and each time the motion was denied.

[37] *Id.* at 54.

[38] RP (Aug. 12, 2008) at 7.

[39] *Id.*

[40] *Id.* at 9.

[41] *Id.*

[42] *Id.* at 67.

Despite physical restraints, Thompson disrupted the proceedings throughout, regularly using profanity, disparaging the court and counsel, and making threats. He was frequently removed from the courtroom as a result.[43]

*A. First Common Issue: Right to Conflict-Free Counsel*

¶42 Thompson contends the court denied him his Sixth Amendment and article I, section 22 rights to conflict-free counsel when it refused to appoint an attorney to replace John Hicks.

¶43 Whether to grant such a request is a matter within in the court's discretion.[44] To warrant substitution of counsel, Thompson must show good cause, "such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication."[45] It is not enough that a defendant has lost confidence or trust in his attorney.[46] "Counsel and defendant must be at such odds as to prevent presentation of an adequate defense."[47] Thompson alleged both a communications breakdown and an irreconcilable conflict.

¶44 Communications Breakdown. It is apparent that communication between Hicks and Thompson collapsed early in their relationship. But it is also plain from the record that the breakdown was entirely one-sided. Hicks never stopped trying to communicate with Thompson, even though his efforts met with verbal abuse and threats. "It is well settled that a defendant is not entitled to demand a reassignment of counsel on the basis of a breakdown in

---

[43] Thompson makes no claim that the numerous orders removing him from the courtroom were unnecessary or in any way improper.

[44] *State v. Schaller*, 143 Wn. App. 258, 267, 177 P.3d 1139 (2007).

[45] *Id.* at 267-68.

[46] *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997).

[47] *Schaller*, 143 Wn. App. at 268.

communications where he simply refuses to cooperate with his attorneys."[48]

■ ¶45 <u>Irreconcilable Conflict: Defense Theory.</u> Thompson also alleged an irreconcilable conflict with Hicks. To determine whether the trial court erred in failing to substitute counsel on this basis, we consider the extent of the conflict, the adequacy of the inquiry, the timeliness of the motion, and the effect of the conflict on the representation actually provided.[49] "If the representation is adequate, prejudice must be shown."[50]

■■ ¶46 The principal basis for Thompson's allegation of conflict was that Hicks would not pursue a mental defense. Thompson wanted to focus his defense upon his state of mind after he was released from prison and required to register as a sex offender, and to present his theory that the State incited "vigilante justice" against sex offenders.[51] In an ex parte hearing before Judge Canova, Thompson explained that he wanted to present evidence that he had suffered abuse, as a child and while in prison, which contributed to his inability to tolerate abuse of authority: "[W]hen I get put in a corner where I am attacked by authority, I retaliate."[52] Thompson's theory appears to be that the situation he found himself in upon his release from custody was so insufferable that he was not accountable for the crimes he then committed.

¶47 Thompson's theory was insupportable, but Hicks went to great lengths to determine whether a viable mental defense existed. Dissatisfied with the quality of one competency evaluation, he obtained funds to conduct another. He engaged a nationally renowned psychiatrist to evaluate

[48] *Id.* at 271.

[49] *In re Pers. Restraint of Stenson,* 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (*Stenson* II); *Schaller,* 143 Wn. App. at 270.

[50] *Schaller,* 143 Wn. App. at 270.

[51] RP (Sept. 14, 2007) at 10.

[52] RP (Oct. 8, 2007) at 9.

Thompson's mental illness at the time of the offense, but the expert concluded that none existed. Based upon his investigation, Hicks believed Thompson's chosen defense "is contradicted by the facts, it is contradicted by the examinations I have [had] done on him, but most importantly, it is not a defense at all . . . and I cannot proceed with it."[53] Further, he was concerned that Thompson's proposed defense would open the door to his cumulative psychiatric history, "the most prominent feature of which . . . is sexual sadism, [which] is quite compatible with, unfortunately, the charges being brought against him."[54]

¶48 The court, in the person of several experienced trial judges, agreed with Hicks' assessment. Judge Halpert observed that any mistreatment Thompson suffered upon release was not a legal defense and would not be admissible at trial. Judge Canova explained that Thompson needed "an expert who is credentialed who will at least argue in your behalf that a particular defense exists."[55] Given that no such testimony could be obtained, the court was "not at this point convinced that no matter which attorney you would pick to represent you that anyone in that situation would be able to support this particular defense that you want to bring."[56]

¶49 A disagreement over defense theories and trial strategy does not by itself constitute an irreconcilable conflict entitling the defendant to substitute counsel because decisions on those matters are properly entrusted to defense counsel, not the defendant.[57] Thus, in *State v. Stenson* (*Stenson* I), the court found no irreconcilable con-

---

[53] *Id.* at 6.

[54] *Id.* at 17.

[55] *Id.* at 21.

[56] *Id.*

[57] *Stenson* II, 142 Wn.2d at 734 (" 'appointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense' " (quoting *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987))).

flict where the defendant sought substitution of counsel because his attorney refused to pursue a defense that was unsupported by the facts.[58] The court emphasized that counsel provided excellent representation in spite of the disagreement and also noted the trial court's opinion that "it was certainly conceivable new counsel would give the [d]efendant the same advice that present counsel were giving."[59] Given the great difficulty that appointing new counsel would have caused, the court held it was not an abuse of discretion to refuse to appoint new counsel.[60]

¶50 The same is true here. Hicks provided excellent representation in spite of the disagreement, new counsel would have given the same advice, and great difficulty would have resulted from substitution of counsel.

¶51 Irreconcilable Conflict: Discovery. Thompson's other frequent complaint involved a perceived failure to provide him with discovery. This issue was the subject of several hearings. Hicks, the prosecutor, and the court all went to great lengths to ensure that Thompson received all discovery to which he was entitled. At one point, counsel agreed to provide Thompson with a new copy of the 8,000 pages of discovery. Subsequent hearings show that counsel continued to work to provide Thompson with the materials he requested.[61] It appears that Thompson was not satisfied partly because he believed Judge Halpert had ordered the State to provide him with unredacted discovery, and partly because he considered material such as "media reports" to fall within the order. He was incorrect in both beliefs.[62] Media reports are not within the State's disclosure obliga-

---

[58] 132 Wn.2d 668, 734, 940 P.2d 1239 (1997).

[59] *Id.* at 736-37.

[60] *Id.* at 737.

[61] *See, e.g.*, RP (July 24, 2008) at 25-27 (Hicks had transcripts for Thompson and the State had security camera footage Thompson wished to see, but Thompson refused to come to court without a "drag order").

[62] *See, e.g.*, RP (June 27, 2008) at 5 ("I am denying your motion to dismiss [for discovery violations] on the face of it for the reasons that I indicated earlier. I

tion, and Judge Halpert did not order unredacted discovery. Judge Robinson eventually concluded that "Mr. Thompson's been provided with all of the discovery as that term is used in the criminal rules."[63]

¶52 Neither the nature nor the extent of the conflict between Thompson and his attorney justified substitution of counsel.

¶53 Irreconcilable Conflict: Hicks' Efforts To Withdraw. Thompson also emphasizes Hicks' efforts to be removed from the case and cites *Holloway v. Arkansas* for the proposition that the court should defer to counsel's opinion about conflicts with clients and, presumably, order substitute counsel at appointed counsel's request.[64] But *Holloway* concerned an actual conflict of interest involving joint representation of codefendants and is inapposite here. Further, though Hicks repeatedly moved to withdraw and described his conflict with Thompson in the direst of terms,[65] he also acknowledged that "if another attorney is put in the same situation, it probably would involve the same table turning, table up-ending acrimony I foresee at trial."[66] This view was shared by every judge who addressed the issue.[67]

---

haven't found any such orders that you be given unredacted discovery. And much of what you address here is not discovery in the sense of being material which is either generated by or in the custody of the State with reference to the criminal actions here.").

[63] RP (Mar. 26, 2009) at 24.

[64] 435 U.S. 475, 485-86, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).

[65] Hicks indicated that the acrimony between him and Thompson was so great that "just about any lawyer may be able to do better" and that he "simply cannot provide him effective assistance." RP (Oct. 8, 2007) at 25; RP (Oct. 15, 2007) at 29. He also stated that he was "the worst person to be in a courtroom with him at this point" and that "the lesser of two evils is for him to go pro se [with] standby counsel other than myself, just because of this rancor." RP (Oct. 15, 2007) at 81, 83.

[66] RP (Oct. 15, 2007) at 29-30.

[67] As Judge Canova put it, "[H]aving just spent some time with Mr. Thompson over the last two weeks, I certainly understand [Hicks'] position. The reality is, as I noted to Mr. Thompson, however, I have no belief that any other counsel, any other competent counsel, let me put it that way, would have any better luck with

■ ¶54 <u>Inadequate Inquiry.</u> Thompson contends his motions were denied without adequate inquiry. A court learning of a conflict between defendant and counsel has an " 'obligation to inquire thoroughly into the factual basis of the defendant's dissatisfaction.' "[68] Such an inquiry must "provide a 'sufficient basis for reaching an informed decision.' "[69] The court "may need to evaluate the depth of any conflict between defendant and counsel, the extent of any breakdown in communication, how much time may be necessary for a new attorney to prepare, and any delay or inconvenience that may result from substitution."[70] Thompson alleges "the trial court here conducted no inquiry into the conflict . . . whatsoever."[71]

¶55 This assertion is spurious. Thompson's motions to remove Hicks in favor of substitute counsel or pro se status were heard in at least nine hearings before Judges Halpert, Canova, MacInnes, and Robinson. Judges Halpert, Canova, and MacInnes each held at least one ex parte hearing with the prosecutor absent, to allow Thompson and Hicks to fully articulate the extent of their conflict and the breakdown in communication.

¶56 Although the court made no formal inquiry into the time necessary for new counsel to prepare or the inconvenience and delay that substitution of counsel would cause, it was evident from the circumstances that any substitution would cause significant delay. Thompson faced three trials

---

Mr. Thompson than you have had, or his prior counsel have had. . . . Mr. Thompson's view of what he should be allowed to present is not supported by the law or the facts. That is the reality and no other competent attorney is going to give him any other advice than that, and that is going to upset Mr. Thompson, and Mr. Thompson is going to develop the same kind of relationship with that new counsel that he has unfortunately developed with you." RP (Oct. 15, 2007) at 82.

[68] *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991) (quoting *United States v. Hart*, 557 F.2d 162, 163 (8th Cir. 1977)).

[69] *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001) (quoting *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986)).

[70] *Id.*

[71] Br. of Appellant at 32.

on 16 charges arising from three different incidents. There were more than 8,000 pages of discovery. Further, it was apparent to each judge who considered the matter that appointment of new counsel would not alleviate Thompson's concerns. The court's inquiry was exhaustive and more than sufficient.

■ ¶57 Because the conflict and communication breakdown were attributable entirely to Thompson and could not be reasonably expected to resolve with substitution of counsel, the court did not abuse its discretion by denying Thompson's motions.

■ ¶58 Constructive Denial of Counsel: Inadequate Defense. Thompson also contends the failure to appoint substitute counsel in these circumstances resulted in a constructive denial of his right to counsel. He relies on *United States v. Trung Tran Nguyen*, in which the Ninth Circuit observed, "Even if present counsel is competent, a serious breakdown in communications can result in an inadequate defense."[72] The *Nguyen* court wrote that "a defendant is denied his Sixth Amendment right to counsel when he is 'forced into a trial with the assistance of a particular lawyer with whom he [is] dissatisfied, with whom he [will] not cooperate, and with whom he [will] not, in any manner whatsoever, communicate.' "[73]

¶59 The collapse of the attorney-client relationship may so degrade the quality of the defense as to deny the accused effective representation. But that was clearly not so here. Despite Thompson's unrelenting insolence, verbal abuse, and refusal to cooperate, Hicks remained a capable and determined advocate. He filed motions to suppress evidence. He vigorously opposed the State's efforts to present evidence of Thompson's past sex crimes. He used cross-examination and closing argument to highlight gaps in the

---

[72] 262 F.3d 998, 1003 (9th Cir. 2001).

[73] *Id.* at 1003-04 (alterations in original) (quoting *Brown v. Craven*, 424 F.2d 1166, 1169 (9th Cir. 1970)).

State's evidence. Hicks even managed to "accommodate Mr. Thompson's view that he was a victim of a conspiracy" in the rape case.[74] Tavel, the attorney appointed as liaison counsel, performed Thompson's direct examinations and attempted to minimize the damage resulting from his testimony while still allowing Thompson to express his view of the cases. And during closing arguments, Hicks attempted to explain Thompson's obviously untruthful testimony in a way the jury might understand.[75] Thompson was effectively represented in spite of the breakdown in the relationship.

¶60 That fact distinguishes his case from some on which he relies. In *Brown v. Craven*, the court found Brown's defense to be "perfunctory" and stated that it would not be unreasonable to believe that had Brown been represented by an attorney in whom he had confidence, he would have been convicted of a lesser crime.[76] In *United States v. Moore*, the conflict resulted in the attorney conducting only one interview in a 69-day period leading up to trial.[77] Here, however extreme the conflict between Thompson and his counsel, there is no evidence to suggest the representation Thompson received was in any way inadequate. All evidence is to the contrary.

¶61 Thompson was not denied his right to effective representation and in fact received excellent representation.

---

[74] RP (Feb. 25, 2009) at 39.

[75] "You can conclude that he did lie about being present at Deborah['s] residence. You can conclude he did lie about his background and whether or not he is guilty of past offenses—and still focus on the evidence with the knowledge that a person scared enough, who happens to be innocent, will lie." RP (May 26, 2009) at 94.

[76] 424 F.2d 1166, 1169-70 (9th Cir. 1970).

[77] 159 F.3d 1154, 1159 (9th Cir. 1998).

## B. Second Common Issue: Right to Self-Representation

¶62 Thompson next contends he was denied his right under the Sixth Amendment and article I, section 22 to represent himself at trial.[78] We review the denial of a request for pro se status for abuse of discretion.[79] "The *unjustified* denial of this right requires reversal."[80]

¶63 Assessment of a defendant's request to waive the right to counsel and represent him- or herself involves several competing constitutional questions. Courts must honor a properly made request for self-representation. But because a defendant necessarily waives the right to counsel by invoking the right to represent himself, courts must also indulge in " 'every reasonable presumption' " against waiver of the right to counsel.[81] The request must therefore "be unequivocal, knowingly and intelligently made, and must be timely."[82]

¶64 To determine the validity of such a request, the trial court must examine the facts and circumstances and the entire record.[83] The court should also engage in a colloquy to ensure the defendant understands the risks and consequences of self-representation.[84]

¶65 Until just before his first trial, Thompson's requests to represent himself were equivocal and were obviously intended in part to bolster his effort to have Hicks replaced. He told Judge Kessler, "I do not feel I am qualified" to

---

[78] *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010).

[79] *Id.* at 504.

[80] *Stenson* I, 132 Wn.2d at 737 (emphasis added).

[81] *Madsen*, 168 Wn.2d at 504 (internal quotation marks omitted) (quoting *In re Det. of Turay*, 139 Wn.2d 379, 396, 986 P.2d 790 (1999)).

[82] *State v. Vermillion*, 112 Wn. App. 844, 851, 51 P.3d 188 (2002).

[83] *State v. Hemenway*, 122 Wn. App. 787, 791, 95 P.3d 408 (2004).

[84] *Id.*

proceed pro se.[85] He told Judge Canova, "I do not want to proceed pro se because I cannot investigate like this, and I cannot present my defense like this."[86] He characterized his motion for pro se status as "a last resort motion."[87] He said he was "forced" to proceed pro se and that his request was not made "intelligently, knowingly, and voluntarily."[88] When Judge Canova asked directly whether he wished to proceed without counsel, Thompson simply continued to complain about Hicks. Just weeks before his first trial, Judge Robinson concluded Thompson "is not saying he wants to represent himself. He's saying he wants a different lawyer."[89]

¶66 Thompson maintains that his requests to Judge Canova and Judge MacInnes were not equivocal, pointing out that he specifically cited *Faretta v. California*, which recognized a defendant's Sixth Amendment right to self-representation.[90] But *Faretta* is not a magical incantation rendering any assertion of the right unequivocal. In the October 2007 hearing before Judge Canova, the reference occurred during a lengthy diatribe against Hicks' alleged failure to provide Thompson with discovery. It was not connected to his request to represent himself.

¶67 Thompson's later requests for pro se status before Judge MacInnes and Judge Robinson were less equivocal. In a February 2008 hearing, he again cited *Faretta*, stating, "[Y]ou're refusing me pro se status that has already been fucking recognized under the United States Supreme Court under the *Faretta* ruling."[91] By this point, however, Thompson had made self-representation infea-

---

[85] RP (Mar. 1, 2006) at 5.

[86] RP (Oct. 8, 2007) at 10.

[87] *Id.* at 4.

[88] RP (Oct. 15, 2007) at 43.

[89] RP (July 11, 2008) at 4.

[90] 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

[91] RP (Feb. 15, 2008) at 9.

sible by demonstrating he could not (or would not) control his behavior in the courtroom. Before Judge MacInnes, Thompson regularly engaged in violently disruptive outbursts, despite repeated warnings from Hicks and from the court that his inability to control himself in the courtroom jeopardized his motion to represent himself.[92] At his last hearing with Judge MacInnes, she concluded that Thompson had, by his conduct, waived his right to self-representation.

¶68 Thompson's behavior did not improve when Judge Robinson took over. He continued to threaten to kill Hicks and harm court officers, repeatedly called Judge Robinson names and told her to "die in hell,"[93] and continuously interrupted the proceedings so that he had to be removed from the courtroom on a regular basis.[94] In July 2008, Judge Robinson found that Thompson's behavior was "intentional and deliberate."[95] Like Judge MacInnes, she concluded that Thompson had waived his right to represent himself.

¶69 Thompson contends his behavior is irrelevant. He relies on our Supreme Court's opinion in *State v. Madsen*.[96] Madsen had interrupted the court "on several occasions."[97] The court held his conduct was not grounds for denial of his right to self-representation, stating that "[t]he value of respecting this right outweighs any resulting difficulty in

---

[92] *See, e.g., id.* at 7 ("You cannot interrupt me. If we can't get through this hearing, I can't make a determination that you can go pro se, if you'll not even allow me to get through a hearing."); RP (Feb. 28, 2008) at 15 (Hicks advises, "If you will allow the judge to just ask you the questions she's required to ask, she'll probably grant your motion to go pro se. And then you can rant and rave all you want and get your motion.").

[93] RP (Jan. 26, 2009) at 28.

[94] *See* Br. of Resp't at 58 (listing 22 instances of Thompson being removed from court for disruptions). Thompson does not challenge any decision to remove him from court.

[95] RP (July 24, 2008) at 54.

[96] 168 Wn.2d 496, 229 P.3d 714 (2010).

[97] *Id.* at 501.

the administration of justice."[98] The court held that a defendant may not be denied pro se status "merely because the defendant is unfamiliar with legal rules or because the defendant is obnoxious."[99]

¶70 But Thompson was not merely obnoxious, and his behavior did not simply cause difficulty in the administration of justice. Rather, his behavior was so extreme as to preclude any proceedings at all, forcing the court to remove him from the courtroom in order to conduct its business.

¶71 "The right of self-representation is not a license to abuse the dignity of the courtroom."[100] The court "may deny pro se status if the defendant is trying to postpone the administration of justice" and may "terminate pro se status if [he] is sufficiently disruptive or if delay becomes the chief motive."[101]

¶72 Five judges tried to persuade Thompson to control himself, without success. Thompson made it abundantly clear he intended to obstruct the administration of justice. The judges repeatedly concluded that his behavior constituted deliberate attempts to disrupt and obstruct the proceedings.[102] When told he could be present in court only if

[98] *Id.* at 509.

[99] *Id.*

[100] *Faretta*, 422 U.S. at 834 n.46.

[101] *Madsen*, 168 Wn.2d at 509 & n.4; *see also Vermillion*, 112 Wn. App. at 851 (courts may deny a request for self-representation that is made "for the purpose of delaying the trial or obstructing justice").

[102] *See* RP (Feb. 28, 2008) at 16 ("I have had I'm not sure at this point how many hearings with Mr. Thompson. The product of those hearings each and every time has been Mr. Thompson determining that he will not answer the court's questions, that he will dictate what is being said, that he will make very inappropriate—and, as I say, that is probably the least descriptive word—completely inappropriate comments to certainly his counsel and to the court and has given consistently no indication that Mr. Thompson would abide by court rules, abide by those policies and procedures related to the orderly process of a trial."); RP (July 24, 2008) at 54 ("He has repeatedly threatened physical harm to Mr. Hicks, to Mr. O'Toole, judicial officers . . . . I'm also prepared to find this is intentional and deliberate."); RP (Aug. 12, 2008) at 53-54 ("I have no question based on my own observations of Mr. Thompson and based on my review of the reports from Western State dated May

he stopped being disruptive, he told the court, "It won't happen, Your Honor. It will not happen, okay."[103]

¶73 In this respect, his case is similar to *State v. Hemenway*.[104] Like Thompson, Hemenway refused to speak or respond at his initial appearance, sought affidavits of prejudice against multiple judges, refused to cooperate with his attorneys, obtained substitution of counsel at least once, and repeatedly demanded to be excused from the court when he did not get his way.[105] When the court refused to appoint another new attorney, Hemenway, like Thompson, said he was being forced to proceed pro se.[106]

¶74 Division Two of this court held that "considering Hemenway's continuous and purposeful disruptive misconduct toward the court and its officers, the totality of the circumstances of Hemenway's self-representation request, and the presumption against waiver of a right to counsel," the trial court did not err in denying the request.[107]

¶75 Thompson's behavior was far more purposefully disruptive than Hemenway's, and the record establishes that Thompson's motive was to delay or prevent trial for as long as he could, rather than to actually achieve self-representation. The court properly denied his requests for pro se status.

## C. Third Common Issue: Restraints

· ¶76 Thompson contends the court violated his right to due process by ordering that he be held in restraints during all three trials.

---

21st, 2008 and August 9th, 2006, that Mr. Thompson's outbursts are the result of a conscious effort to disrupt these proceedings.").

[103] RP (Aug. 12, 2008) at 9.

[104] 122 Wn. App. 787, 95 P.3d 408 (2004).

[105] *Id.* at 792-94.

[106] *Id.* at 794.

[107] *Id.* at 796.

¶77 Generally, an accused has the right to "the physical indicia of innocence," which include the right to be "brought before the court with the appearance, dignity, and self-respect of a free and innocent man."[108] Shackles and prison garb are "inherently prejudicial" because they single the defendant out as a dangerous or guilty person and thus threaten his or her right to a fair trial.[109]

¶78 But the court has discretion to order appropriate security measures where there is "evidence which indicates that the defendant poses an imminent risk of escape, that the defendant intends to injure someone in the courtroom, or that the defendant cannot behave in an orderly manner while in the courtroom."[110] Physical restraints should be used only as a last resort.[111] Before ordering physical restraints, the court must consider less restrictive alternatives.[112]

¶79 There was abundant evidence of the need for restraints on Thompson. He had engaged in numerous episodes of assaultive or threatening behavior in the jail, including attempting to assault a court detail officer while in restraints (April 2005), threatening two officers (October 2005), charging at officers while in restraints (January 2006), spraying urine and feces at another inmate (March 2006), refusing to be handcuffed (March 2006), refusing to return to his cell (June 2007), attempting to strike officers with broken leg irons, and threatening to kill officers and their families (December 2007). Thompson also acted out in or near courtrooms. He jerked away from officers in an apparent escape attempt (March 2008), causing injuries to himself and another. He repeatedly threatened to kill his

---

[108] *State v. Finch*, 137 Wn.2d 792, 844, 975 P.2d 967 (1999).

[109] *Holbrook v. Flynn*, 475 U.S. 560, 567-68, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986); *State v. Jaime*, 168 Wn.2d 857, 861-62, 233 P.3d 554 (2010).

[110] *Finch*, 137 Wn.2d at 850.

[111] *Id.*

[112] *Id.*

attorney and the prosecutor, and screamed, in reference to Judge Robinson, "Power-tripping bitches! They oughta be killed!"[113]

¶80 Further, Thompson was facing his final "strike," and the court observed that he had nothing to lose by assaulting people or attempting to escape. The court also observed that "Mr. Thompson has shown considerable strength and shown that the threat of physical pain has not prevented him from initiating physical altercations with corrections officers in the past."[114] There is no question Thompson presented a threat to witnesses, attorneys, corrections officers, and court staff.

¶81 The court considered several security alternatives, including "no restraints, 'soft' restraints, the Oregon boot, hard restraints, the restraint chair, and the Band-It Prisoner Transport and Courtroom Control System."[115] Before the second trial, the court also considered the presence of a sheriff's deputy with a stun gun. The court concluded the Oregon boot was insufficient because it would not prevent Thompson from injuring people in the courtroom. The court indicated that the Band-It System, which allows an observer to deliver an electric shock, was inadequate by itself because "the two-second reaction time of the person operating the system would give Mr. Thompson an opportunity to injure someone before he would be incapacitated."[116]

¶82 For the first trial, the court concluded Thompson should be held in soft restraints in the courtroom if he could behave appropriately and would otherwise watch the trial by video feed. For the second trial, the court concluded that "[b]oth the Band-It and soft restraints used at defendant's waist and hands are necessary to protect the safety of all

---

[113] Clerk's Papers at 544.

[114] Clerk's Papers at 257.

[115] Clerk's Papers at 256. The court also considered gagging Thompson to muffle his verbal outbursts.

[116] Clerk's Papers at 256-57.

people in the courtroom during trial."[117] In all three trials, the restraints were to be concealed so the jury would not see them. However, the restraints required Thompson to testify from counsel table. And in one instance, the jury may have seen the restraints.

¶83 Thompson contends the court did not properly consider less restrictive alternatives before ordering him restrained. Specifically, he argues the court "simply did not consider increasing the number of courtroom deputies or requiring several deputies to sit behind Thompson as an alternative to using physical restraints."[118] He relies on *Holbrook v. Flynn*, which suggests that the presence of armed guards in the courtroom is less prejudicial than the use of shackles or other physical restraints,[119] and argues the court's failure to consider such an option necessitates remand for a new trial.

¶84 But Thompson cites no authority for the proposition that the court must consider every possible alternative or any particular alternative before ordering the defendant restrained, and we do not agree that a crowd of uniformed deputies surrounding the defendant would be less prejudicial than hidden restraints. Further, the court's observations that Thompson could cause injury to someone in the two seconds it would take a guard to activate the Band-It System and that the "threat of physical pain has not prevented him from initiating physical altercations with corrections officers"[120] suggest that the presence of additional guards would do little to diminish security concerns. Because Thompson needed to be prevented—not just discouraged—from acting on his murderous threats, the court did not err in ordering physical restraints and requiring

---

[117] Clerk's Papers at 549.

[118] Br. of Appellant at 73.

[119] 475 U.S. 560, 569, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).

[120] Clerk's Papers at 257.

Thompson to remain secured at counsel table during his testimony.

## II. ISSUES PERTAINING TO FIRST TRIAL

### A. Jury Unanimity

¶85 The first trial involved Thompson's assault and unlawful imprisonment of two women and a man in a Seattle apartment building. The charges included two counts of second degree assault with sexual motivation based on Thompson's conduct in (1) punching Lisa in the chin and taking her handbag when she tried to exclude him from the building, then taking more of her personal property in the elevator; (2) ordering Megan to remove her shirt and bra in the elevator; and (3) punching Richard in the head when he tried to come to the women's aid. Both assault counts were elevated to felonies based on the allegation that they were committed "with intent to commit the felony of [r]obbery and [i]ndecent [l]iberties."[121]

¶86 The to-convict instructions for these counts required the jury to find that Thompson had assaulted Lisa and Richard and "[t]hat the assault was committed with intent to commit robbery in the second degree or indecent liberties."[122]

¶87 Thompson contends he was entitled to a unanimity instruction with respect to which crime, robbery or indecent liberties, formed the basis of each count. "Where the State presents evidence of several distinct acts, any one of which could be the basis of a criminal charge, the trial court must ensure that the jury reaches a unanimous verdict on one particular incident."[123]

¶88 But the State did not charge Thompson with multiple acts that could constitute each count of assault.

---

[121] Clerk's Papers at 294.

[122] Clerk's Papers at 375-76.

[123] State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989).

Instead, Thompson was charged with alternative means of committing the crimes. Where a defendant is charged with committing a crime by alternative means, unanimity is not required as to which alternative jurors rely upon so long as the State presents sufficient evidence to support each alternative.[124] "If there is sufficient evidence to support each alternative means submitted to the jury, the conviction will be affirmed because we infer that the jury rested its decision on a unanimous finding as to the means."[125] The jury found Thompson guilty of both robbery and attempted indecent liberties, and Thompson does not challenge the sufficiency of the evidence supporting those convictions.

¶89 Thompson also contends he was entitled to a unanimity instruction with respect to the sexual motivation allegations on the burglary, unlawful imprisonment, and assault charges. He argues the sexual motivation allegation could have been predicated on separate acts because there was evidence that he touched Lisa's arm and later instructed Megan to disrobe, and the State failed to elect the act upon which it relied.

¶90 This is incorrect. The prosecutor elected in closing argument to rely on Thompson's demand that Megan disrobe:

> Then I need to talk, I think, about one more, and then I'll be done. The State has charged, [h]as alleged, that a number of these crimes were committed for purposes of the defendant's— were allegedly committed with sexual motivation. That's count one, the burglary one, when he first got in, the assaults against Lisa . . . and Richard . . . , the unlawful imprisonment of Lisa, Megan, and Richard . . . . Those are all alleged to have been done with sexual motivation.
>
> Jury instruction 37 says the following and defines sexual motivation, quote, "sexual motivation means that one of the purposes for which the defendant committed the crime was for

---

[124] *State v. Randhawa*, 133 Wn.2d 67, 73-74, 941 P.2d 661 (1997).

[125] *Id.* at 74.

the purpose of his sexual gratification." It specifically does not say that that was the only purpose or even if that was the main purpose. *But if you find after your good deliberations that one of the purposes for what he did towards Megan . . . was for his sexual gratification, [he] is guilty.* Do we have any doubt here that one of those purposes was in fact sexually motivated?[126]

The prosecutor did not even mention that Thompson touched Lisa's arm. Because the State clearly identified the act upon which the sexual motivation allegation was based, no unanimity instruction was necessary.

¶91 Further, no unanimity instruction is required where the evidence indicates a " 'continuing course of conduct.' "[127] Thompson argues there can be no such course of conduct here because the acts were directed at different victims. He offers no authority for that proposition. "To determine whether criminal conduct constitutes one continuing act, the facts must be evaluated in a commonsense manner."[128] For example, the evidence indicates distinct acts when criminal conduct occurs at different times and places.[129] Here, the touching of Lisa's arm and the demand that Megan disrobe occurred in the same place within a very short period of time. The evidence supported the State's theory that Thompson committed several crimes against three different victims, all for the purpose of sexually assaulting Megan and/or Lisa. A unanimity instruction was not required.

### B. Evidentiary Sufficiency: Sexual Motivation

¶92 Thompson next contends there is insufficient evidence to support the jury's finding that his unlawful

---

[126] RP (Sept. 30, 2008) at 99 (emphasis added).

[127] *Handran*, 113 Wn.2d at 17 (quoting *State v. Petrich*, 101 Wn.2d 566, 571, 683 P.2d 173 (1984)).

[128] *Id.*

[129] *Id.*

imprisonment of Richard was committed with sexual motivation. In reviewing a challenge to the sufficiency of the evidence, all reasonable inferences from the evidence are drawn in favor of the State.[130] Evidence is sufficient if, when viewed in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.[131]

¶93 An allegation of sexual motivation requires the State to prove that sexual gratification was among the purposes for commission of the charged offense.[132] The State must present "evidence of identifiable conduct by the defendant while committing the offense which proves beyond a reasonable doubt the offense was committed for the purpose of sexual gratification."[133]

¶94 Relying on State v. Halstien for the proposition that " 'the finding of sexual motivation [must] be based on some conduct forming part of the body of the underlying felony,' "[134] Thompson contends the State must prove that he "was sexually gratified by restraining [Richard]."[135] He suggests the finding was instead "derived from the nebulous inference that because [Richard] happened to stumble upon Thompson's encounter with [the women], and ended up in the elevator with them, Thompson's crime against [Richard] was committed with sexual motivation."[136]

¶95 Thompson mischaracterizes the record. The testimony was that Richard tried to intervene in Thompson's attack on Megan and Lisa and was beaten and held in the

---

[130] State v. Gentry, 125 Wn.2d 570, 597, 888 P.2d 1105 (1995).

[131] Id. at 596-97.

[132] RCW 9.94A.030(47).

[133] State v. Halstien, 122 Wn.2d 109, 120, 857 P.2d 270 (1993) (discussing the parallel juvenile sexual motivation statute).

[134] 122 Wn.2d 109, 120, 857 P.2d 270 (1993) (emphasis omitted) (quoting State v. Halstien, 65 Wn. App. 845, 853, 829 P.2d 1145 (1992)).

[135] Br. of Appellant at 88.

[136] Id.

elevator so that Thompson could accomplish his objectives, which included an act of indecent liberties against Megan. A rational trier of fact could certainly have found that one of Thompson's purposes in holding Richard in the elevator was for sexual gratification in his conduct involving the women.

¶96 We see no basis for reversal in the first trial.

## III. ISSUES PERTAINING TO SECOND TRIAL

¶97 Thompson's second trial involved charges of burglary in the first degree, rape in the first degree, and taking a motor vehicle without permission. The State alleged Thompson entered Bernadette's home through a window, repeatedly raped her, rubbed bleach onto her body in an apparent attempt to obliterate evidence, and took her car.

### A. Evidence of Past Rapes

¶98 The court admitted evidence of the 1985 rapes under RCW 10.58.090 and ER 404(b).[137] We review rulings on the admission of evidence for abuse of discretion, which occurs when the trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons.[138]

¶99 ER 404(b) generally prohibits the use of evidence of other crimes to prove character, in order to show action in conformity therewith. Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[139]

¶100 The court found that evidence of Thompson's other rapes was admissible to prove identity. To admit

---

[137] Our Supreme Court has since held that RCW 10.58.090 is unconstitutional. *State v. Gresham*, 173 Wn.2d 405, 432, 269 P.3d 207 (2012). Because we conclude the evidence was properly admitted under ER 404(b), we do not address RCW 10.58.090.

[138] *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

[139] ER 404(b).

evidence on this basis, similarities between the charged offense and the prior crimes must be sufficient to create a high probability the crimes were committed by the same person.[140] "[D]istinctive features must be shared between the . . . crimes."[141]

¶101 The court identified substantial similarities. Each of the victims was a white female in her 20s. Thompson attacked them in their homes in the early morning hours while they were sleeping. He spent significant time in each victim's home before waking her. He awoke them by touching them or by covering their mouths. He covered each victim's face or head during the assault. He disabled or took each victim's telephone. He tied each victim with a ligature he found at the scene. He told each victim he would kill her. He raped three of the four victims vaginally with his fingers. In two incidents, including Bernadette, he ejaculated onto the victim's back and bed sheets and then took the sheets.

¶102 Thompson contends the prior rapes were not admissible to prove identity because they were not identical. He points out that he used a vibrator to rape one of the 1985 victims. He brutalized one victim but did not torture the others. He "fell back and then fled" when one woman shoved him.[142] He did not use bleach in any of the 1985 rapes. But Thompson offers no authority for the proposition that to be admissible under ER 404(b), the prior acts must share *every* feature. Rather, the question is whether the crimes shared sufficient distinctive features to create the probability they were perpetrated by one person.

¶103 Thompson contends the common features were not unusual or distinctive. He contends that being in a victim's home for a significant period of time before assaulting her, disabling her telephone, covering her mouth, using a liga-

---

[140] *State v. Vy Thang*, 145 Wn.2d 630, 643, 41 P.3d 1159 (2002).

[141] *Id.*

[142] Br. of Appellant at 110.

ture, digital penetration, ejaculating outside of her body, and taking her personal property are all common features of premeditated stranger rape and do not suggest the work of a single individual.

¶104 We disagree. These features are distinctive, not common, especially in combination. They are strongly suggestive of a single perpetrator. Thompson's description of the shared features omits some of the more distinctive aspects, including entering homes while victims slept and spending time rummaging around, taking personal items of little value, awakening victims by covering their mouths, covering their heads or faces during the rapes, and using something found at the scene as a ligature.

¶105 "Even when features are not individually unique, appearance of several features in the cases to be compared, especially when combined with a lack of dissimilarities, can create sufficient inference that they are not coincidental, thereby justifying the trial court's finding of relevancy."[143] There were sufficient distinctive similarities among these crimes to create a high probability the similarities were not mere coincidence and the acts were committed by the same person. The court did not abuse its discretion in admitting the evidence under ER 404(b).[144]

## B. Judicial Comment

¶106 A judge is constitutionally prohibited from conveying to the jury an opinion about the merits of a case, or instructing the jury that a fact issue has been established.[145] "Thus, any remark that has the potential effect of

---

[143] *Thang*, 145 Wn.2d at 644.

[144] Because the evidence of prior crimes was relevant to the issue of identity, we reject Thompson's argument that the evidence was inadmissible under ER 403 because its only probative value was to show a propensity for committing violent sex offenses.

[145] *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006); WASH. CONST. art. IV, § 16.

suggesting that the jury need not consider an element of an offense could qualify as judicial comment."[146]

¶107 Bernadette testified that after Thompson sexually assaulted her and rubbed bleach onto her back and into her vagina, he wandered about, saying, "[W]hat am I going to do with you?"[147] She offered him her car keys and told him where to find her car. He eventually took the keys and her phone and left. The car was recovered about two weeks later. She testified she did not offer her car "freely and voluntarily," but only to get him to leave.[148]

¶108 Over the defendant's objection, the court gave the following jury instruction regarding the charge of taking a motor vehicle without permission:

> Permission means to consent to the doing of an act which, without such consent, would be unlawful. In order to consent to an act or transaction, a person must act freely and voluntarily and not under the influence of threats, force or duress.[149]

Thompson does not contend this is an incorrect statement of the law but argues that in context, it was an impermissible comment on the evidence and urged the jury to discount evidence that the victim freely offered her car "without instigation or suggestion by her assailant."[150]

¶109 Thompson contends this case is analogous to *State v. Hermann*, a first degree theft case in which the court instructed the jury, " 'Evidence of a retail price may be sufficient to establish value.' "[151] There, the court held the instruction improperly directed the jury to give greater

[146] *Levy*, 156 Wn.2d at 721.

[147] RP (Feb. 17, 2009) at 65.

[148] *Id.* at 100.

[149] Clerk's Papers at 598.

[150] Br. of Appellant at 121.

[151] 138 Wn. App. 596, 606, 158 P.3d 96 (2007).

weight to that evidence than to the evidence of wholesale value.[152]

¶110 In *Hermann*, however, the court's instruction suggested the jury could disregard certain evidence entirely. In essence, the court defined "value" as the "retail price," making evidence concerning the wholesale price irrelevant.[153] Here, the court's instruction did not make the evidence that Bernadette offered Thompson her car irrelevant. Rather, it gave the jury a proper framework with which to consider that evidence.

¶111 Thompson also relies on *In re Detention of R.W.*, an involuntary commitment proceeding.[154] *R.W.* is inapposite. There, the trial court instructed the jury that certain evidence " 'should be given great weight in determining whether a new less restrictive alternative commitment is in the best interest of the respondent or others.' "[155] The instruction was held to be an improper comment on the evidence because "the jury is the sole judge of the weight of the testimony."[156] The instruction here did not direct the jury to give any particular weight to any particular evidence.

¶112 The court's instruction was not a comment on the evidence.

## C. Evidentiary Sufficiency

¶113 Thompson relies on Bernadette's testimony that she offered Thompson her car to argue there was insufficient evidence to support his conviction for taking a motor vehicle without permission. But the evidence established that Bernadette offered Thompson her car only to

---

[152] *Id.* at 607.

[153] *Id.*

[154] 98 Wn. App. 140, 144, 988 P.2d 1034 (1999).

[155] *Id.* (emphasis omitted).

[156] *Id.*

stop a brutal assault and avoid being killed. A rational jury could infer that her "permission" was not valid in these circumstances. Further, Thompson did not argue he had permission to take the car; he testified he was never there and never committed any of the crimes.

¶114 Viewed in the light most favorable to the State, a rational jury could conclude beyond a reasonable doubt that Bernadette did not give effective permission to Thompson to take her car.

## D. Prosecutorial Misconduct

¶115 One of the 1985 victims, Virginia B., was unwilling to testify in these trials. The prosecutor indicated he did not intend to introduce the fact of Thompson's conviction in her case unless Thompson opened the door. Thompson contends the prosecutor committed reversible misconduct by cross-examining him using his own statements about that crime.

¶116 During direct examination, Thompson testified he was convicted of "so-called sexual assaults" in 1985 "based only . . . on my so-called voluntary confession."[157] He talked about the civil commitment proceeding that followed his 18 years of incarceration and the challenges he faced upon his release, and he denied committing any of the crimes for which he was on trial.

¶117 On cross-examination, he testified he was the victim of pervasive government oppression and a conspiracy to have him killed. Regarding his 1985 convictions, he testified that "a lot of those charges in '85 were trumped up, believe me."[158] He claimed he " was coerced and intimidated into confessing to things that I did not do."[159]

¶118 The prosecutor then referred Thompson to his testimony in his civil commitment trial:

---

[157] RP (Feb. 25, 2009) at 61.

[158] *Id.* at 89.

[159] *Id.* at 90.

Q: Let's talk, Mr. Thompson, about what you stated under oath. "Question: I'd like to now ask you some questions about responsibility. Who's responsible for the rapes of Susan ..., Carol ..., Marcia ... and Virginia ...? Answer: I am wholeheartedly. I have taken responsibility for those crimes. Question: Do you blame anyone else? Answer: No, I would never blame anybody else for that."

Did I read that correctly, Mr. Thompson?

A: That could have been my testimony, yeah. I don't remember specifically.[160]

¶119 Thompson claimed he was under "extreme duress" when he testified in the civil commitment trial, "the police concocted a lot of that information and tried to make me out to be somebody I wasn't," and "I didn't do what they said I did. . . . They were trying to make it out a lot worse than it actually was."[161] Specifically, "about me torturing people and trying to kill them and all that, no, I didn't do that. That's what I'm claiming you guys fabricate, that I was in there torturing these people, beating them to death and all this crap. I said no, I didn't do all that."[162] He denied ever acting for purposes of sexual gratification. When the prosecutor asked him to explain the rapes, Thompson responded, "I was mad at society."[163]

¶120 The prosecutor then asked whether Thompson recalled confessing to the 1985 assaults. Thompson responded that his confession was not signed and "I don't believe I okayed that confession being admitted."[164] He refused to answer further questions about his statements to police. The prosecutor pointed out that his confession about one of the 1985 rapes matched that victim's testimony in the

---

[160] *Id.* at 93-94.

[161] *Id.* at 95-96.

[162] *Id.* at 96.

[163] *Id.* at 97.

[164] *Id.* at 98.

present trial. Thompson suggested she was lying but stated, "I have immense sympathy for any victims, I truly do."[165]

¶121 The prosecutor pursued Thompson's claim of "empathy for the victims," asking whether he recalled making specific statements to detectives detailing the gruesome rape of Virginia.[166] Thompson responded by asking whether his statement was signed and indicating he did not recall his conversation with detectives. Defense counsel made an initial objection, the basis for which is not clear from the record and which was overruled.[167] There was no further objection.

¶122 The prosecutor asked a series of questions that included details from his confession to raping Virginia, but Thompson refused to respond: "I'm not answering anything about that confession or that conviction, for that matter. . . . I don't recall any of it. That was 20-something years ago. I paid my debt to society."[168]

¶123 Based upon this exchange, Thompson contends the State improperly relied on facts not in evidence because it did not introduce his testimony from the commitment trial or the testimony of Virginia. He argues the prosecutor committed further misconduct by referencing that conviction in closing argument.

¶124 To prevail on a claim of prosecutorial misconduct, a defendant must show the conduct was both improper and prejudicial in the context of the entire record.[169] Courts will find prejudice only when there is a substantial likelihood that the misconduct affected the verdict.[170] A failure to object waives any error unless the

---

[165] *Id.* at 98-99.

[166] *Id.* at 99.

[167] The matter was addressed at sidebar and not transcribed.

[168] RP (Feb. 25, 2009) at 100-01.

[169] *Stenson* I, 132 Wn.2d at 718-19.

[170] *Id.*

conduct was "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury."[171]

¶125 A prosecutor is entitled to impeach a defendant's testimony. Thompson testified that his 1985 confessions were coerced and that he did not "do what they said I did."[172] This directly contradicted his testimony at the civil commitment trial where, under oath, he accepted full responsibility for the rapes. Those statements, and his statements to police, were admissible against him under ER 801(d)(2).

¶126 Thompson relies on *State v. Allen S.*[173] But *Allen S.* involved impeachment of a jailhouse informant, not the defendant. The court was examining the relevance of hearsay offered for impeachment and held that impeachment with prior inconsistent statements is improper when the witness "fails to say anything pertinent to the case" because there is " 'no testimony to impeach.' "[174] *Allen S.* has no application here. Under ER 801(d)(2), Thompson's prior statements are not hearsay. His testimony on direct was inconsistent with his previous statements regarding the prior rapes and was a proper subject for impeachment.

¶127 Thompson also relies on *State v. Jones*, which held that misconduct occurred when the prosecutor introduced *inadmissible* evidence on redirect examination of an officer and then emphasized that evidence in closing argument.[175] *Jones* is inapposite because, here, the "evidence" referenced in cross-examination was admissible.

¶128 Thompson has not established improper conduct.

¶129 We see no basis for reversal in the second trial.

---

[171] *Id.* at 719.

[172] RP (Feb. 25, 2009) at 95.

[173] 98 Wn. App. 452, 464-66, 989 P.2d 1222 (1999).

[174] *Id.* at 464-65 (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE § 256, at 310 (3d ed. 1989)).

[175] 144 Wn. App. 284, 294-97, 183 P.3d 307 (2008).

## IV. ISSUES PERTAINING TO THIRD TRIAL

### A. Amendment of Information

¶130 Thompson was initially charged with first degree premeditated murder in the death of Deborah B. The State later amended the information to add an alternative count of first degree felony murder, with the predicate felonies being rape in the first or second degree, or burglary in the first degree.

¶131 Subsequently, the legislature enacted RCW 10.58-.090, which allowed admission of evidence of other sexual offenses when a defendant is charged with a sex offense.[176] Because felony murder is not a sex offense and does not become so even when the predicate felony is rape,[177] the State moved to amend the information to add sexual motivation allegations to the murder charges. Thompson objected. The court allowed the amendment, which made each count a "sex offense" for purposes of RCW 10.58.090. Thompson challenges the ruling allowing the amended information.

¶132 A trial court may permit an information to be amended at any time before verdict if substantial rights of the defendant are not prejudiced.[178] The decision to allow such an amendment is reviewed for abuse of discretion.[179]

¶133 The State is required to file a sexual motivation allegation "when sufficient admissible evidence exists,

---

[176] *But see Gresham*, 173 Wn.2d at 432 (holding RCW 10.58.090 unconstitutional). *Gresham* does not affect our analysis of this issue because the court also properly admitted the same evidence under ER 404(b), and as Thompson was sentenced to another term of life without parole, he cannot contend the allegations affected his sentence.

[177] *State v. Thomas*, 138 Wn.2d 630, 633-34, 980 P.2d 1275 (1999).

[178] CrR 2.1(d).

[179] *State v. Schaffer*, 120 Wn.2d 616, 621-22, 845 P.2d 281 (1993). A court abuses its discretion if its decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *Magers*, 164 Wn.2d at 181.

which, when considered with the most plausible, reasonably foreseeable defense that could be raised under the evidence, would justify a finding of sexual motivation by a reasonable and objective fact finder."[180]

¶134 Thompson argues the court erred by allowing the State to amend the information because the only evidence supporting the amendment was not admissible unless the amendment itself was permitted.

¶135 This argument assumes that evidence of Thompson's rape of Deborah was irrelevant. It also assumes that evidence of the other rapes was inadmissible under ER 404(b). The trial court found otherwise. Thompson alleges this too was error.

¶136 As in the second trial, the court identified several similarities between Deborah's murder and Thompson's known crimes. Each involved sexual assaults in the victim's home; Deborah was sexually assaulted. Each involved home invasion; a screen had been removed from Deborah's window. Each victim's head or face was covered; evidence indicated Deborah's head was covered with a pillow while she was stabbed. Ligatures were used in all prior rapes; there was evidence that a phone cord was used around Deborah's neck. Thompson threatened the other women with death; Deborah was actually killed. Thompson used bleach to destroy evidence in Bernadette's case; there was an open bottle of bleach on the floor of Deborah's kitchen (in a building with a separate, communal laundry room). In all the rapes, including Deborah's, there was evidence of anal and vaginal penetration from behind. In some cases, including Deborah's, semen was deposited on the outside of the victims' bodies. And in more than one case, including Deborah's, there was evidence of choking.

¶137 Thompson argues these similarities are insufficient because there were also several significant dissimilarities. He particularly points out that three others testi-

---

[180] RCW 9.94A.835(1).

fied to having had sexual relations with Deborah around the time of her death and argues there was evidence he had consensual sex with her but no evidence of rape. But Deborah's body was naked and partially covered by a blanket or towel; Thompson's DNA was found on her thighs, wrists, and under her fingernails. His DNA was also found on a phone cord found near her body, though Thompson denied ever having been in her apartment. There was circumferential redness on the wall of her vaginal canal and bruising inside her anus, though the medical examiner could not say these injuries were necessarily caused by sexual assault. There was also evidence of a struggle; things were in disarray and Deborah had defensive wounds on her hands. The evidence strongly supports the inference that Thompson's sexual encounter with Deborah was not consensual.

¶138 Thompson points to other dissimilarities. Deborah was in her late 30s, whereas the other victims were women in their 20s. The other victims' wrists and ankles were bound with a ligature, but there was only speculation that a ligature had been used with Deborah, and no ligature marks were found on her hands or wrists. The other assaults began while the women were asleep, but there is no evidence that Deborah was asleep when she was attacked.[181] The other victims testified their heads or faces were covered during the assault; according to Thompson, there was no evidence Deborah's head was covered during the sexual assault.[182] But Thompson cites no authority holding that prior crimes must share every distinctive feature to be admissible under ER 404(b). The court did not

---

[181] Nor is there any evidence that she was not. Thompson suggests that because Deborah called a friend late at night with plans to buy crack, she was not asleep when she was attacked. But the State argued she likely "was asleep in the mid-to late morning of August 23, 2004, to be awakened by a man by the name of Curtis Thompson" precisely because she had been up all night. RP (May 26, 2009) at 39.

[182] However, Deborah's body was found facedown with a pillow adjacent to her head, perforated with bloody holes. Feathers were matted into her hair and pushed into a stab wound to the back of her neck, indicating she had been stabbed through the pillow.

abuse its discretion in finding the similarities here to be sufficient.

¶139 Because the evidence was admissible under ER 404(b), the court properly relied upon it to determine whether a sexual motivation allegation was justified. The court did not abuse its discretion in permitting the State to amend the information.

¶140 Thompson next contends evidence of other rapes should have been excluded under ER 403 as more prejudicial than probative. But as indicated above, the evidence was offered to prove identity. Thompson denied being in Deborah's apartment, despite his DNA on her body (including her wrists and under her fingernails) and on the telephone cord. He explained the DNA evidence by suggesting it was planted by police, and by describing an encounter in mid-August with a middle-aged woman who came to his apartment, where they had sex. The court acted within its discretion in finding the evidence was more probative than prejudicial.

## B. Evidentiary Sufficiency: Murder

¶141 Thompson argues that "save for the evidence from Thompson's other convictions, there was little evidence to support the conclusion that Thompson was guilty" of first degree premeditated murder and/or first degree felony murder.[183]

¶142 In a challenge to the sufficiency of the evidence, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the accused.[184] Evidence is sufficient if, when viewed in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the

---

[183] Br. of Appellant at 145-46.

[184] *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

crime beyond a reasonable doubt.[185] Thompson does not argue that properly admitted ER 404(b) evidence should be discounted in considering the sufficiency of the evidence.

 ¶143 To convict Thompson of first degree premeditated murder, the jury had to find beyond a reasonable doubt that he assaulted Deborah with premeditated intent to cause her death and that she died as a result of Thompson's acts.

 ¶144 There was strong evidence of Thompson's guilt, including the following: Thompson's DNA was found on Deborah's thighs and wrists, and under her fingernails. She had been choked, and Thompson's DNA was found on the ends of a telephone cord found near her body that may have been used for that purpose. Deborah's DNA was found on the pants Thompson was wearing when he was arrested on the day she was stabbed to death. Additionally, the common features of the previous rapes support the inference that her death immediately followed her rape and that Thompson was responsible for both.

¶145 Thompson contends the evidence was insufficient to prove premeditation. Premeditated intent "must involve more than a moment in point of time"[186] and involves " 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.' "[187] Premeditation is "the deliberate formation of and reflection upon the intent to take a human life."[188]

¶146 A wide range of proven facts will support an inference of premeditation, including "where multiple wounds were inflicted with a knife or other weapon, there were signs of a struggle, the victim was at some point struck

---

[185] *Id.*

[186] RCW 9A.32.020(1).

[187] *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999) (internal quotation marks omitted) (quoting *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)).

[188] *State v. Hoffman*, 116 Wn.2d 51, 82, 804 P.2d 577 (1991).

from behind, and there was evidence that sexual assault or robbery was an underlying motive."[189]

¶147 There is evidence of every one of those facts in this case. The evidence shows a prolonged and violent struggle. Deborah's room was in disarray. She had defensive wounds on her arms, bruises and scratches on her face, significant bruising under her scalp, and petechiae in her eyes and a linear abrasion on her neck indicating she had been strangled. The fatal injuries were stab wounds to the front of her chest, her side, and the back of her neck, most likely made by a flat-head screwdriver, which was later found in a box with other tools in her closet. Her body was naked and there was evidence of sexual activity consistent with assault, which suggests a motive for the murder and further supports an inference of premeditation. The evidence was sufficient to prove Thompson murdered Deborah with premeditated intent.

¶148 The alternative charge of first degree felony murder required the State to show that Thompson committed or attempted to commit rape in the first degree, rape in the second degree, or burglary in the first degree; that Deborah was not a participant in those crimes; and that in the course of or in furtherance of one of those crimes, Thompson caused her death.

¶149 A person commits the crime of rape in the first degree when he engages in sexual intercourse with another person by forcible compulsion, inflicts serious physical injury, or feloniously enters into the building where the other person is situated.[190] A person commits rape in the second degree when he engages in sexual intercourse with another by forcible compulsion.[191]

¶150 As set out above, there was ample evidence that Thompson raped Deborah. Her injuries were consistent

---

[189] *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006).

[190] RCW 9A.44.040(1)(c), (d).

[191] RCW 9A.44.050(1)(a).

with sexual assault, she had defensive wounds, and there was evidence of a struggle. Thompson asserted he "might have had a sexual encounter" with Deborah but denied being in her apartment.[192] Yet his DNA was found on the telephone cord near her body. The similarities between this case and the other rapes also support the conclusion that Thompson was the perpetrator.

¶151 A person commits the crime of burglary in the first degree when he unlawfully enters or remains in a building with intent to commit a crime against a person or property therein and if, in entering, remaining, or fleeing from the building, the person assaults any other person.[193] The only issue here is whether Thompson's entry was unlawful.

¶152 Deborah's bedroom window was hidden by bushes and trees. When her body was discovered, that window was slightly open with no screen in place. A badly bent window screen was found on the ground under the window. Inside the bedroom, there was a dresser under the window. A vase on the dresser was knocked over, and there was loose dirt on a sheet or towel on the floor in front of the dresser. Loose dirt was not observed anywhere else. The window was covered from the inside when Deborah's body was found, but Thompson could easily have covered it after entering the apartment, just as he had closed the window through which he entered in Bernadette's case. The evidence was sufficient.

¶153 We see no basis for reversal in the third trial.

## V. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

¶154 Pro se, Thompson lists approximately 50 additional errors, which fall into three categories: ineffective assistance of trial counsel, prosecutorial misconduct, and miscellaneous abuses of the trial court's discretion.

---

[192] RP (May 21, 2009) at 216.

[193] RCW 9A.52.020(1).

¶155 Several of Thompson's alleged errors have been thoroughly addressed by counsel and are therefore not proper matters for his statement of additional grounds under RAP 10.10(a).[194] These include issues related to the denial of pro se status, restraints, improper cross-examination in the second trial, invalid use of prior rapes evidence, the breakdown in communications with appointed counsel, and the sufficiency of the evidence in the third trial.

¶156 Thompson provides no argument to support any of the other alleged errors and little context to assist the court's review. Thompson is not required to cite to the record or authority, but he must still "inform the court of the nature and occurrence of alleged errors."[195] Consequently, many of the alleged errors are unreviewable under RAP 10.10(c). We turn to those for which we have a basis for review.

## A. Abuses of Discretion

¶157 Thompson contends the trial court abused its discretion in myriad ways. Few of these contentions merit discussion.

¶158 Thompson argues the court erred by instructing the jury it must be unanimous, therefore precluding a hung jury in the first trial. With respect to the instruction concerning the jury's use of the general verdict form, the court indicated, "Because this is a criminal case, each of you must agree for you to return a verdict."[196] This is the basic concluding instruction in the Washington pattern jury

---

[194] RAP 10.10(a) permits a defendant/appellant to file a pro se statement of additional grounds "to identify and discuss those matters which the defendant/appellant believes have not been adequately addressed by the brief filed by the defendant/appellant's counsel."

[195] RAP 10.10(c) (appellate court not obligated to search record in support of claims made in statement of additional grounds for review); *State v. Meneses*, 149 Wn. App. 707, 716, 205 P.3d 916 (2009), *aff'd*, 169 Wn.2d 586, 238 P.3d 495 (2010).

[196] Clerk's Papers at 401.

instructions, and the identical language was proposed by the defense in this case. There was no error.

¶159 Thompson argues the court abused its discretion by ordering him held in a restraint chair during Megan's perpetuation deposition and removing him when he objected. The claim is without merit. Thompson made no objection to the restraints and asked to be excused. The court solicited a response to that request from the prosecutor, at which point Thompson erupted and was removed. There was no error.

¶160 He contends the court erred in allowing the use of statements he made at Harborview Medical Center following his arrest. In the CrR 3.5 hearing, the court determined those statements were not the result of a custodial interrogation. There was no error in admitting them.

¶161 Thompson argues the court abused its discretion in not hearing or granting certain motions, including for return of his property, to dismiss for discovery violations, for a new trial, for recusal, and for polling the jury on media exposure and security measures. As Thompson was represented by counsel, the court appropriately refused to rule on these pro se motions.

## B. Ineffective Assistance of Counsel

¶162 To prevail on a claim of ineffective assistance of counsel, Thompson must show his attorney's performance fell below an objective standard of reasonableness based on consideration of all the circumstances, and that the deficient performance prejudiced the result.[197] We engage in a strong presumption of effective representation and require a defendant to show the absence of legitimate strategic or tactical reasons for the challenged conduct.[198] To show

---

[197] *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nichols,* 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).

[198] *State v. McFarland,* 127 Wn.2d 322, 336, 899 P.2d 1251 (1995).

prejudice, a defendant must prove that but for the deficient performance, there is a reasonable probability that the outcome would have been different.[199]

¶163 Thompson identifies 23 grounds for his ineffective assistance of counsel claims. Only one merits any discussion.

■ ¶164 Thompson argues his counsel was ineffective for failing to request a limiting instruction for the use of the prior rapes evidence.[200] Where the claim of ineffective assistance is based upon counsel's failure to request a particular jury instruction, the defendant must show he was entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice.[201]

¶165 Under the law as it existed at the time, no limiting instruction was necessary because evidence of the other rapes was admissible without limitation under RCW 10.58-.090. Further, we see no possibility that the outcome would have been different even had the evidence been admitted only under ER 404(b) and with a limiting instruction. The claim fails.[202]

## C. Prosecutorial Misconduct

¶166 To prevail on a claim of prosecutorial misconduct, a defendant must show the conduct was both improper and prejudicial in the context of the entire record and circumstances at trial.[203] Courts will find prejudice only if there is a substantial likelihood that the misconduct affected the

---

[199] *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 487, 965 P.2d 593 (1998).

[200] Thompson himself filed a pro se motion requesting a limiting instruction.

[201] *State v. Johnston*, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007).

[202] Thompson requests an evidentiary hearing to develop his ineffective assistance of counsel claim. "If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition." *McFarland*, 127 Wn.2d at 335.

[203] *Stenson* I, 132 Wn.2d at 718.

jury's verdict.[204] Failure to object waives the issue unless the conduct was "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury."[205]

¶167 The only issue warranting analysis is the prosecutor's conduct in closing argument. Thompson contends the prosecutor improperly called him a liar, argued facts not in evidence,[206] and appealed to the jury's passions by arguing they were the "voice of society and the victim" and by crying during his argument.

¶168 The State has wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility.[207] "Where a prosecutor shows that other evidence contradicts a defendant's testimony, the prosecutor may argue that the defendant is lying."[208]

¶169 Here, the prosecutor stopped short of calling Thompson a liar but argued in the third trial that Thompson lied "repeatedly and constantly."[209] The prosecutor cited many examples of Thompson's untruthfulness, which he supported by citing evidence in the record. There was no misconduct.

¶170 The prosecutor did not argue that the jury was the "voice of society and the victim." He argued that despite Deborah's inability to testify, her voice could be heard in the evidence, and that "at the end of the day, there is really only one voice left, and that is yours."[210] There was no misconduct.

---

[204] *Id.* at 718-19.

[205] *Id.* at 719.

[206] This was addressed by counsel.

[207] *State v. Millante*, 80 Wn. App. 237, 250, 908 P.2d 374 (1995).

[208] *State v. McKenzie*, 157 Wn.2d 44, 59, 134 P.3d 221 (2006).

[209] RP (May 26, 2009) at 62.

[210] *Id.* at 79.

¶171 Finally, even if the prosecutor became emotional during closing argument, there was no objection and no indication this was flagrant and ill intentioned. There was no misconduct.

¶172 Affirmed.

SCHINDLER and LAU, JJ., concur.

Reconsideration denied August 6, 2012.

Review denied at 176 Wn.2d 1023 (2013).