## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49703-4-II |
| Respondent, | |
| v. | |
| JOSHUA STEWART BALL, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Joshua Stewart Ball appeals his conviction for assault in the third degree. He contends that the trial court erred by refusing to give his proposed self-defense jury instruction and by denying his motion for a mistrial. Ball also filed a statement of additional grounds (SAG), asserting additional errors. We affirm Ball's conviction.

FACTS

I.   INCIDENT

A.   DRIVING

In the early morning hours of July 13, 2015, Ball began driving north on I-5, from Portland to his home in Longview. Ball nearly sideswiped another vehicle, causing it to veer into another lane. Ball exited the freeway. The other vehicle followed him.

Ball passed several businesses before turning into the parking lot of a fast food restaurant. He turned around, pulled up to the traffic light at the exit of the parking lot, and stopped. The driver of the other vehicle called 911 to report a possibly intoxicated driver after she saw Ball hunched over, with his head on the steering wheel.

B.    ASSAULT AND ARREST

Clark County Deputies Jason Hafer and Wayne Phillips responded and boxed Ball's vehicle in with their vehicles to prevent him from waking and driving away. The engine in Ball's vehicle was still running and Ball sat in the driver's seat unconscious. The deputies simultaneously opened the driver and passenger doors. Phillips shut off the engine and removed the keys from the ignition. Ball awakened and tried to grab the keys.

Hafer identified himself and stated the officers were not trying to steal Ball's car. Ball appeared lethargic. He had a blank stare and drool on his face. The deputies smelled an odor of marijuana coming from the vehicle. Hafer questioned Ball about where he was going, where he was coming from, and why he was at the restaurant. Ball either did not respond to the questions or he responded by repeating the question.

About five minutes later, Deputy Ryan Preston arrived to take over the investigation. Within Ball's earshot, Hafer began telling Preston the information he had gathered, including that he suspected Ball was an impaired driver. Ball put a piece of gum in his mouth and began chewing it until Preston ordered him to spit it out, which he did.

Ball then snapped out of his lethargic state and became annoyed. He became confrontational toward the deputies about what to do with his gum. Ball complied with Preston's request to step out of the car. At this point, Ball's and the deputies' accounts of events differed.

The deputies testified that Ball immediately "locked eyes" on Preston, focusing all attention on him. 1 Report of Proceedings (RP) at 257. Preston viewed this action as a "pre-fight indicator" and took a step back to give himself more time to react to Ball's actions. 2 RP at 257. Ball then began unbuttoning his shirt. Preston ordered Ball to stop and to leave his shirt on, but Ball ignored him. Ball had a "very aggressive demeanor." 2 RP at 260.

Once Ball got within two feet of Preston, he began swinging his arms at Preston with closed fists. He tried to punch Preston in the head. Preston deflected these blows from his head and pushed Ball back toward Hafer. Ball continued throwing punches at Preston and some of them landed. Preston and Hafer tried to bring Ball to the ground and handcuff him, but he actively resisted. Together, Hafer, Preston, Phillips, and another deputy who had arrived restrained Ball and placed him in handcuffs. During the struggle, Ball grabbed Preston's hand and cut his finger, causing bleeding and discomfort. The deputies used a hobble to restrain Ball's legs and placed him in the back of Preston's vehicle.

During the struggle, Ball cycled through yelling profanity, telling the deputies they were not gods and that they would be judged, and yelling that he was a cancer survivor.

C.    BALL'S VERSION OF EVENTS

Ball suffered from chronic myeloid leukemia (CML), a type of cancer for which he had taken medication since 2012. Both his disease and his medications caused him considerable fatigue. Ball's doctor, Kathryn Kolibaba, testified about his condition, his medication, and its side effects. She noted that Ball has experienced hot flashes as a symptom of the CML and its treatment. Ball referred to his cancer treatment as chemotherapy.

While driving to Longview, Ball testified that he felt fatigue kick in and felt his "eyes getting heavy." 3 RP at 368. He decided to get off the road and rest before continuing. He believed he parked in the fast food restaurant's parking lot and did not realize he was still in the road until the police contacted him. He agreed that he had been slow to realize what was happening and why he was being questioned when he awoke to the officers at his car. He stated his memory about the event was hazy due to "brain fog" caused by his chemotherapy. 3 RP at 374.

3

Ball testified that, when the police asked him to get out of the car, his body "started tripping" and "wasn't reacting right." 3 RP at 375. He felt anxiety and an adrenaline rush coming over him. He began to feel that his body was overheating and that he needed "to cool off as soon as possible." 3 RP at 376. In order to cool off, he decided to get into the open air, remove his clothes, and spin his arms around. Once he exited the car, he began removing his shirt and the officers "Rodney King'd" him. 3 RP at 377. One of them grabbed him from behind and slammed him to the ground. Ball thought he was going to die.

Ball said that when he gets the hot feeling he felt after exiting the car, he usually goes to the emergency room for hydration. When the officers took him to the ground, he said he was "trying to get into the air and get all—get all that extra heat and weight off [him]." 3 RP at 380. He said he felt like there was a car on top of him and he couldn't breathe.

Ball testified that he never had any intention to hurt anyone and was just trying to cool off. He denied ever throwing punches at Preston. He said he never intentionally assaulted or hurt anyone.

The State charged Ball with assault in the third degree against Preston and being in actual physical control while under the influence.

II.    TRIAL

A.    ERRATIC TESTIMONY AND MISTRIAL MOTION

Ball testified at trial. On cross-examination, he seemed to become confused. The prosecutor described his behavior on the stand as "somewhat erratic" and "progressively so on cross-examination when certain points were raised." 4 RP at 436. The trial court observed that "the behavior that he exhibited . . . [was] very consistent with the behavior that the officers provided." 4 RP at 443.

The following day, Ball moved for a mistrial on the basis that Kolibaba had informed his attorney that Ball may be unable to testify due to his medications because of mood and concentration issues and that these issues had caused Ball's erratic testimony.

The trial court expressed its disappointment that the issue had been brought up so late, especially since Kolibaba's warning e-mail had been sent to Ball's lawyer several weeks before the trial had started. It found that there had not been any judicial or prosecutorial error. It stated, "[t]here may have been tactical or strategy decisions by the Defense that may have backfired, but that is purely a tactical or strategical matter," and then denied Ball's motion for mistrial. 4 RP at 444.

Without objection, Ball recalled Kolibaba to testify about Ball's ongoing medications and their effects on his ability to testify. Kolibaba testified that his medications "cause challenges in mood and memory that made [her] very concerned about [Ball's] ability to withstand and perform at his best in trial." 4 RP at 514. She detailed the specific medications, their side effects, and her causes for this concern.

B.    SELF-DEFENSE INSTRUCTION

Ball proposed a self-defense jury instruction and the State objected. The proposed instruction stated:

> It is a defense to a charge of Assault in the Third Degree that force used was lawful as defined in this instruction.
> A person may use force to resist an arrest by someone known by the person to be a police officer only if the person being arrested is in actual and imminent danger of serious injury from an officer's use of excessive force. The person may employ such force and means as a reasonably prudent person would use under the same or similar circumstances.
> The County has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the County has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to this charge.

Clerk's Papers (CP) at 55; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 17.02.01, at 257 (3d ed. 2008).

The trial court ruled that it had heard no evidence that would support the issuance of the instruction. It noted that "[t]here's been no evidence that Deputy Preston at any point initiated the contact and the testimony has been that each of the officers, based upon the level of force used by the defendant at the time, each grabbed an arm and a leg and then the hobble." 4 RP at 462. It offered to reconsider its decision based on the remaining testimony, but concluded that the instruction was not appropriate based upon the lack of evidence.

After the close of Ball's case and the State's rebuttal, Ball requested the court reconsider its decision as to the self-defense instruction. He highlighted his testimony about feeling like he was suffocating and that there was a truck on him and his need for relief, arguing that this met the minimal threshold for the instruction. The court concluded that the additional testimony did not convince it that the force used by Ball was reasonable. It ruled:

> There's been no testimony, other than Mr. Ball's testimony that he flailed in response to being touched by the officers, or as he stated, "Rodney King'd" that he felt he was being suffocated by a car or something was on his chest. The overwhelming testimony was that he initiated the contact with Deputy Preston, that in order to thwart the aggressive actions by Mr. Ball, one officer grabbed [a]n arm. I believe that was Deputy Hafer. Another officer grabbed the other arm. That may have been Deputy Preston. A third officer, Deputy Beck, may have come into play and then a Deputy Phillips may also have come into play by grabbing the [hobble]
>
> So the testimony so far has been that any force used was to place [Ball] under arrest or at least get him into custody based upon his actions. There does not appear to be any force used by the officers to suggest that, one, it was excessive; or, two, that it was initiated to allow a self-defense instruction to be utilized in this case.
>
> Based upon my review of the facts and of the instruction, I'm going to go ahead and deny the request for WPIC 17.02.01.

4 RP at 549-50.

The jury found Ball guilty of assault in the third degree, but not guilty of being in actual physical control while under the influence. Ball appeals his conviction.

ANALYSIS

I.     SELF-DEFENSE JURY INSTRUCTION

Ball contends that the trial court deprived him of his right to a fair trial by refusing to give a jury instruction on self-defense. He contends that the trial court applied the wrong legal standard by weighing credibility of witnesses rather than viewing the evidence in the light most favorable to the defense in making its decision.

"'To be entitled to a jury instruction on self-defense, the defendant must produce some evidence demonstrating self-defense; however, once the defendant produces some evidence, the burden shifts to the prosecution to prove the absence of self-defense beyond a reasonable doubt.'" *State v. McCreven*, 170 Wn. App. 444, 462, 284 P.3d 793 (2012) (quoting *State v. Walden*, 131 Wn.2d 469, 473-74, 932 P.2d 1237 (1997)).

The "general rule in Washington is that reasonable force in self-defense is justified if there is an appearance of imminent danger, not actual danger itself." *State v. Bradley*, 141 Wn.2d 731, 737, 10 P.3d 358 (2000). "A different rule applies, however, if one seeks to justify use of force in self-defense against an arresting law enforcement officer." *Bradley*, 141 Wn.2d at 737. In such a case, "a person may use force to resist arrest only if the arrestee *actually*, as opposed to *apparently*, faces imminent danger of serious injury or death." *Bradley*, 141 Wn.2d at 737. A person may not use force to resist an unlawful arrest unless the officer attempts to inflict injury on the person. *State v. Valentine*, 132 Wn.2d 1, 21, 935 P.2d 1294 (1997).

In this case, Ball testified that, immediately after he exited his car, someone grabbed him from behind and slammed him to the ground. He testified that he did not intend to assault anyone.

7

Ball maintained that he "never had any intention to ever hurt anyone" and was just trying to cool off. 3 RP at 380. It would be inconsistent with Ball's own story for the court to have given a self-defense instruction in this case because Ball testified that he had not intentionally assaulted Preston. There is no evidence from any witness to support the giving of a self-defense instruction.

After our review of the record, we conclude that no evidence supported the giving of a self-defense instruction. Accordingly, the trial court did not err by denying Ball's request for a self-defense jury instruction.

## II. MOTION FOR MISTRIAL

Ball contends that the trial court's denial of his motion for mistrial denied him his right to testify on his own behalf. He contends that his "mental condition had deteriorated to the point that he could no longer effectively present his defense." Br. of Appellant at 28. Accordingly, he claims that "the trial court's refusal to grant [his] motion for a mistrial denied [him] his right to present meaningful testimony on his own behalf under Washington Constitution, Article 1, § 22, and United States Constitution, Sixth Amendment." Br. of Appellant at 28.

We review a trial court's denial of a mistrial for abuse of discretion. *State v. Garcia*, 177 Wn. App. 769, 776, 313 P.3d 422 (2013). The trial court abuses its discretion "only when 'no reasonable judge would have reached the same conclusion.'" *Garcia*, 177 Wn. App. at 776 (quoting *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012)). The denial of a mistrial motion should "be overturned only when there is a substantial likelihood that the error affected the jury's verdict." *Garcia*, 177 Wn. App. at 776.

The federal and state constitutions both provide criminal defendants the right to testify on their own behalf. *State v. Robinson*, 138 Wn.2d 753, 758, 982 P.2d 590 (1999). "Only the defendant has the authority to decide whether or not to testify." *Robinson*, 138 Wn.2d at 758.

In this case, Ball chose to waive his right to remain silent. He chose to testify and present his side of the story. He described his day in Portland, his becoming drowsy on the drive home, and then his interaction with the deputies. He has not identified what part of his trial testimony was problematic, instead referring to his doctor's warning and "observations of the defense attorney, the prosecutor and the judge." Br. of Appellant at 26.

Even if Ball had specified the problematic testimony, he cites no Washington case, and we have found none, that considers a defendant's erratic or less than optimal testimony on the witness stand to constitute a denial of the defendant's right to testify. Because Ball testified at trial, his right to testify was not violated. Accordingly, the trial court did not err by denying his motion for mistrial.

III.    STATEMENT OF ADDITIONAL GROUNDS

A.      INEFFECTIVE ASSISTANCE OF COUNSEL

Ball contends that his attorney committed a "procedural error" by allowing him to "stand trial on 70 [mg] of predisone [sic]." SAG at 1. This assertion appears to be a claim of ineffective assistance of counsel due to his attorney's failure to raise Ball's incompetence to stand trial.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) that defense counsel's representation was deficient, and (2) that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. Representation

is deficient if, after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 446 U.S. at 688). Prejudice exists if there is a reasonable probability that, except for counsel's errors, the results of the proceedings would have differed. *Grier*, 171 Wn.2d at 34. If either prong is not satisfied, the defendant's claim fails. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

A defendant faces a strong presumption that counsel's representation was effective. *Grier*, 171 Wn.2d at 33. Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

Washington law provides that "[n]o incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." RCW 10.77.050. "'Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel.'" *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 862, 16 P.3d 610 (2001) (quoting *Godinez v. Moran*, 509 U.S. 389, 402, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993)). A criminal defendant is incompetent if he or she "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(15). "If the defendant is receiving medication, he may still be competent to stand trial if the medication enables him to understand the proceedings and to assist in his own defense." *Fleming*, 142 Wn.2d at 862.

In this case, Ball took the stand and testified as to his own recollection of the events that led to his arrest and the criminal charges. His doctor sent his attorney an e-mail several weeks before trial warning that Ball was "on high dose steroids for graft vs host disease" and that the medications "affect[] mood and concentration." CP at 40. She stated that "[i]f you and Josh decide to proceed, then of course I will support that. As always, he is perfectly compliant with follow up—office visits every week—and is doing well managing a very complicated medical regimen." CP at 40.

There was no evidence in this case to suggest that Ball could not understand the nature of the charges against him or could not assist in his own defense. Accordingly, his attorney was not deficient for not arguing that he was incompetent.

### B.    OUTBURST AND PREJUDICED JURY

Ball contends that there was an "outburst in the courtroom influencing the jury" and that there was a "prejudiced jury." SAG at 1. Ball is not required to cite to the record or authority, but he must still "'inform the court of the nature and occurrence of alleged errors.'" *State v. Thompson*, 169 Wn. App. 436, 493, 290 P.3d 996 (2012) (quoting RAP 10.10(c)). We are "not obligated to search [the] record in support of claims made in [the] statement of additional grounds for review." *Thompson*, 169 Wn. App. at 493 n.195. To the extent Ball refers to an "outburst in the courtroom," he argues in his brief that his conduct on the witness stand necessitated a mistrial. SAG at 1. Matters that "have been thoroughly addressed by counsel" are "not proper matters for [the] statement of additional grounds under RAP 10.10(a)." *Thompson*, 169 Wn. App. at 493.

11

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for the public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Lee, J.