# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  52459-7-II |
| Respondent, | |
| v. | |
| JASON LEMAR DILLINGHAM JENKINS, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Jason Lemar Dillingham Jenkins appeals his jury conviction for two counts of third degree assault and two counts of unlawful possession of a controlled substance.  He argues that the trial court erred by (1) declining his proposed jury instruction on voluntary intoxication and (2) imposing an interest accrual provision related to the legal financial obligations (LFOs) in his judgment and sentence.  The State argues that the trial court properly denied Dillingham Jenkins's request to instruct the jury on voluntary intoxication and concedes that the trial court erred by imposing the interest accrual provision.  In addition, Dillingham Jenkins raises two issues in a statement of additional grounds (SAG) for review.

We hold that the trial court did not err by denying Dillingham Jenkins's request to instruct the jury on voluntary intoxication, and any error in failing to give the instruction was harmless beyond a reasonable doubt.  We also hold that the court did err by imposing an interest accrual provision regarding LFOs.  Finally, we hold that Dillingham Jenkins raises no issues requiring

reversal in his SAG. Consequently, we affirm Dillingham Jenkins's conviction, but remand to the trial court to strike the interest accrual provision from his judgment and sentence.

FACTS

I. ASSAULT

In September 2017, Tacoma Firefighter Daniel O'Leary responded to a report of a "man down" who was possibly suffering from a seizure. Verbatim Report of Proceedings (VRP) at 329. When O'Leary arrived, he observed Dillingham Jenkins covered in leaves and dirt and laying in a large grassy area in front of a building that appeared to be a school. O'Leary approached Dillingham Jenkins and noticed he appeared "altered." VRP at 332. O'Leary attributed this to either drugs, alcohol, a seizure, or diabetes. O'Leary assisted Dillingham Jenkins to his feet and helped him into a waiting ambulance. Additional medical personnel placed Dillingham Jenkins on a gurney, secured his arms and legs with safety restraints, and loaded him into the ambulance.

Initially, Dillingham Jenkins was quiet and calm. When emergency medical technician (EMT) John Correia took Dillingham Jenkins's arm to start a blood draw, Dillingham Jenkins quickly "exploded," and began fighting and kicking all those around him and accusing the medical personnel of "stealing his jewelry." VRP at 3360. Dillingham Jenkins freed his legs from the safety restraints and kicked Correia squarely in the chest, knocking him out of the back door of the ambulance.

Dillingham Jenkins, appearing "angry and focused," stepped out of the ambulance once it was stopped and approached O'Leary and Correia with fists. VRP at 338. Dillingham Jenkins then "zeroed in" on O'Leary. VRP at 338. Dillingham Jenkins assumed a "boxing position" and began swinging and jabbing his fists, hitting O'Leary in the ear and arm. VRP at 338.

The first responders called the police and waited in their vehicles until police arrived. While they were waiting, O'Leary went up to the building and advised the individuals inside to lock the doors.

Tacoma Police Officer Ryan Hovey responded to the scene for a "Code Blue" emergency request for assistance from the fire department. VRP at 291. According to Officer Hovey, Dillingham Jenkins "appeared high." VRP at 293. He based his conclusion on the facts that Dillingham Jenkins was not paying attention to the police officers or firefighters when police arrived, he laid on the ground without being asked to, and he was "kind of sweaty and excited." VRP at 293-94. However, Dillingham Jenkins was compliant while police arrested him. He did not "flail around" or kick or punch the officers. VRP at 300-01.

While searching Dillingham Jenkins, officers found a white substance that appeared to be methamphetamine; they also discovered two credit cards belonging to people other than Dillingham Jenkins in his wallet. After the police officers had Dillingham Jenkins in custody, they restrained him on the gurney and put him back in the ambulance. Correia and his partner transported Dillingham Jenkins to the hospital.

A hospital security officer was advised that a "combative patient" was arriving at the hospital, so, per protocol, the security officer searched Dillingham Jenkins for weapons when he arrived. VRP at 490. During the search, the security officer discovered a plastic bag with a "black tar substance" inside and three "clear-type stones." VRP at 492. The security officer informed a police officer of what he found. Dillingham Jenkins claimed the drugs were "weed seed." VRP at 445. Subsequent testing confirmed that the bag contained methamphetamine and heroin.

No. 52459-7-II

Registered Nurse Brooke Carpenter observed Dillingham Jenkins as police and medics escorted him into the hospital. Carpenter described Dillingham Jenkins's demeanor as "calm." VRP at 570. But she explained that he would not answer questions from hospital staff and "kept saying that he got jumped over and over." VRP at 574. Carpenter was advised that Dillingham Jenkins may have been "smoking Spice[1] before he arrived" at the hospital. VRP at 574-75. Carpenter performed a drug screen on Dillingham Jenkins and concluded that he was positive for marijuana, methamphetamine, and opiates.

## II. PROCEDURE

The State charged Dillingham Jenkins with one count of third degree assault, one count of second degree identity theft, two counts of second degree possession of stolen property, and two counts of unlawful possession of a controlled substance. The State amended the information and charged Dillingham Jenkins with an additional count of third degree assault. The case proceeded to a jury trial.

At trial, Correia testified that Dillingham Jenkins looked at him when he kicked him and described the kick as "intentional." VRP at 409. Correia's partner testified that Dillingham Jenkins's kick "appeared to be targeted." VRP at 510.

O'Leary and Correia testified that the punch to O'Leary's arm did not appear to be "random flailing" but rather a "directed punch." VRP at 339. O'Leary further testified that Dillingham Jenkins was "purposely coming after" him. VRP (Aug. 15, 2018) at 345. O'Leary contemplated

---

[1] "Spice" refers to "a synthetic marijuana or marijuana with methamphetamine laced in it." VRP at 573.

4

defending himself, but when he noticed someone in a FedEx vehicle filming the incident, he continued retreating.

Carpenter testified that behaviors associated with use of Spice are the same as those associated with methamphetamine: "agitated behavior, rapid pressured speech, increased heart rate, large pupils, involuntary movements, aggressive behavior." VRP at 573.

After the State rested, defense counsel proposed that the trial court instruct the jury on voluntary intoxication. Defense counsel cited testimony that Dillingham Jenkins had appeared to be under the influence of drugs during the incident and that drugs were detected in his system at the hospital. Defense counsel proposed the following jury instruction on voluntary intoxication:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted with intent.

Clerk's Papers (CP) at 74. The State opposed the instruction. After hearing argument from both sides, the trial court determined there was insufficient evidence to support the instruction and declined to give it. The court explained that while there was some evidence that Dillingham Jenkins was positive for marijuana, methamphetamine, and opiates, it was unknown,

> [T]o what extent that any of this would have affected the defendant's ability to form intent other than what was testified to by the medics a[t] the scene, which was that he was initially sort of out of it and then wasn't out of it anymore.
>
> . . . .
>
> There just isn't enough evidence to support all of that.

VRP at 597, 599.

The jury found Dillingham Jenkins guilty of two counts of third degree assault and two counts of unlawful possession of a controlled substance.[2]

The trial court sentenced Dillingham Jenkins to 60 months in prison, followed by 12 months of community custody. The court found Dillingham Jenkins indigent and waived all discretionary LFOs. The court imposed the mandatory $500 crime victim penalty assessment fee and included an interest accrual provision. Dillingham Jenkins appeals. CP at 485.

ANALYSIS

I. VOLUNTARY INTOXICATION INSTRUCTION

A. SUBSTANTIAL EVIDENCE DID NOT SUPPORT THE PROPOSED INSTRUCTION

Dillingham Jenkins argues that the trial court erred by declining his proposed jury instruction on voluntary intoxication. The State argues that the trial court properly denied counsel's request because there was not substantial evidence that the intoxicants affected Dillingham Jenkins's ability to form the requisite intent for the crime. We agree with the State.

We review de novo a trial court's refusal to give an instruction based on an issue of law. *State v. George*, 161 Wn. App. 86, 95, 249 P.3d 202 (2011). "'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" *State v. Aguirre*, 168 Wn.2d 350, 363-64, 229 P.3d 669 (2010) (emphasis and internal quotation marks omitted) (quoting *Keller v. City of Spokane*, 146 Wn.2d 237, 249, 44 P.3d 845 (2002)). "To obtain a voluntary intoxication instruction, the defendant must show "(1) one of the elements of the crime charged is a particular

_____

[2] The trial court granted defendant's motion to dismiss one count of identity theft and two counts of possession of stolen property.

mental state, (2) there is substantial evidence that the defendant ingested the intoxicant, and (3) evidence that his ingestion of an intoxicant affected his ability to acquire the required mental state for the crime." *State v. Classen*, 4 Wn. App. 2d 520, 536, 422 P.3d 489 (2018).

The first element is met because the parties agree that the crime of third degree assault required that Dillingham Jenkins intended to commit a crime. The second element is met because the parties further agree that there was substantial evidence that Dillingham Jenkins ingested marijuana, methamphetamine, and opiates. Thus, only the third element is in dispute.

"To satisfy the third element, there must be substantial evidence of the effects of the intoxicants on the defendant's mind or body." *Classen*, 4 Wn. App. 2d at 536. "Substantial evidence is 'evidence sufficient to persuade a fair-minded, rational person of the truth of the [matter].'" *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006) (quoting *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)). "The evidence must reasonably and logically connect a defendant's intoxication with his inability to form the requisite mental state." *Classen*, 4 Wn. App. 2d at 536-37. "A person can be intoxicated and still be able to form the requisite mental state to commit certain crimes." *Classen*, 4 Wn. App. 2d at 537.

While it is not necessary to present expert testimony that alcohol intoxication affected a defendant's ability to form the required mental state to commit a crime, the same cannot be said about intoxication by drugs like methamphetamine and heroin. *Classen*, 4 Wn. App. 2d at 537. Because it is not common knowledge how methamphetamine and heroin affect a person's ability to form the requisite intent, a defendant is required to provide "competent evidence" showing how his ability to form intent was affected by the drugs. *Classen*, 4 Wn. App. 2d at 538.

Here, evidence was adduced at trial that would permit a jury to find that Dillingham Jenkins was intoxicated. O'Leary testified that Dillingham Jenkins appeared "altered," and he attributed it to either drugs, alcohol, a seizure, or diabetes. VRP at 332. Officer Hovey testified that Dillingham Jenkins was not paying attention to firefighters or medical responders when police arrived, he laid on the ground without being asked to, he was "kind of sweaty and excited," and he "appeared high." VRP at 293-94. A search of Dillingham Jenkins revealed bags of methamphetamine and heroin. Carpenter testified that at the hospital Dillingham Jenkins "kept saying that he got jumped over and over" and would not answer questions from hospital staff. VRP at 574. Moreover, Dillingham Jenkins tested positive for marijuana, methamphetamine, and opiates.

As the trial court ruled, the testimony did not show "to what extent that any of this would have affected the [Dillingham Jenkin]'s ability to form intent other than what was testified to by the medics [at] the scene, which was that he was initially sort of out of it and then wasn't out of it anymore." VRP at 597.

In fact, the evidence established the opposite. Correia testified that Dillingham Jenkins was looking at him when he kicked him square in the chest, and he described the kick as "intentional." VRP at 409. Correia's partner observed the incident and testified that the kick "appeared to be targeted." VRP at 510. Dillingham Jenkins did not damage anything else in the ambulance. O'Leary testified that once Dillingham Jenkins stepped outside the ambulance, he "zeroed in" on O'Leary. VRP at 338. Dillingham Jenkins assumed a "boxing position" and began swinging and jabbing his fists at O'Leary's ear and arm. VRP at 338-39. Correia also saw the blows to O'Leary, and both Correia and O'Leary testified that the punch to O'Leary did not appear

8

to be "random flailing," but rather a "directed punch." VRP at 339. O'Leary added that Dillingham Jenkins was "purposely coming after" him. VRP at 345-46.

Dillingham Jenkins attempts to liken his case to *State v. Walters*, 162 Wn. App. 74, 255 P.3d 835 (2011); *State v. Rice*, 102 Wn.2d 120, 683 P.2d 199 (1984); and *State v. Kruger*, 116 Wn. App. 685, 67 P.3d 1147 (2003). While there was evidence that Dillingham Jenkins was under the influence of marijuana, methamphetamine, and opiates, unlike *Walters*, *Rice*, and *Kruger*, there was no evidence showing *how* his level of drug intoxication impacted his ability to form the requisite intent to assault Correia or O'Leary. Further, *Walters*, *Rice*, and *Kruger* all considered evidence showing that the defendants were intoxicated. *Walters*, 162 Wn. App. at 78; *Rice*, 102 Wn.2d at 122; *Kruger*, 116 Wn. App. at 689. As we held in *Classen*, alcohol intoxication is different than drug intoxication. 4 Wn. App. 2d at 537. Because the effects of methamphetamine and heroin are not "common knowledge," a showing of "competent evidence" is required to demonstrate how the defendant's inability to form intent was affected as a result of his drug intoxication. *Classen*, 4 Wn. App. 2d at 538. There was no such evidence presented in this case.

The testimony elicited at trial affirmatively showed that Dillingham Jenkins intended to assault Correia and O'Leary. Substantial evidence did not support the trial court giving a voluntary intoxication instruction. Because the evidence did not "reasonably and logically connect" Dillingham Jenkins's intoxication with his ability to form the requisite intent, we hold that the trial court did not err by rejecting his proposed jury instruction on voluntary intoxication. *Classen*, 4 Wn. App. 2d at 536-37.

B. Harmless Error

Dillingham Jenkins argues that the trial court erred and that the error was not harmless beyond a reasonable doubt. He claims that the failure to give a voluntary intoxication instruction deprived him of his constitutional right to present a defense. The State argues that any error was harmless beyond a reasonable doubt. We agree with the State and hold that any error was harmless beyond a reasonable doubt.

A defendant has a constitutional right to present a defense. *Aguirre*, 168 Wn.2d at 363. A constitutional error is harmless if we are "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error." *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002). "'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" *Aguirre*, 168 Wn.2d at 363-64 (emphasis and internal quotations marks omitted) (quoting *Keller*, 146 Wn.2d at 249).

Here, "assault" was defined in the jury instructions as, "an intentional, touching, striking, cutting, or shooting of another person . . . ." CP at 89. The jury was further instructed that "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." CP at 90.

Defense counsel argued at length through closing argument that Dillingham Jenkins could not form the requisite intent to commit assault based on his level of intoxication. Defense counsel specifically argued that the testimony that indicated that Dillingham Jenkins appeared "altered" created a reasonable doubt that he intended to assault Correia and O'Leary. VRP at 636-37. The jury rejected this theory by finding that Dillingham Jenkins intended to commit assault beyond a

reasonable doubt. The record supports the jury's verdict. Testimony from eye-witnesses to the assaults established that Dillingham Jenkins's kick to Correia's chest was targeted and intentional. Dillingham Jenkins was purposely coming after O'Leary when he assumed a boxing position and began hitting O'Leary. The punch to O'Leary did not appear to be random flailing, but rather a directed punch.

A voluntary intoxication instruction would not have changed the jury's rejection of defense counsel's theory because the jury instructions allowed defense counsel to argue Dillingham Jenkins's theory of the case. Therefore, we hold that any error in failing to give the instruction was harmless beyond a reasonable doubt.

## II. INTEREST ACCRUAL PROVISION REGARDING THE LFOs

Dillingham Jenkins argues that the trial court erred by imposing an interest accrual provision related to the LFOs when this provision is no longer authorized under current LFO statutes. The State concedes that this provision is no longer statutorily authorized. We accept the State's concession and remand to the court to strike the interest accrual provision from Dillingham Jenkins's judgment and sentence.

The legislature amended former RCW 10.82.090(1) and as of June 7, 2018, no interest shall accrue on nonrestitution LFOs. LAWS OF 2018, ch. 269 § 1; *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). In *Ramirez*, our Supreme Court held that the LFO amendments apply prospectively and are applicable to cases pending on direct review. 191 Wn.2d at 748-49. The crime victim penalty assessment fee is a nonrestitution LFO. *See State v. Catling*, 193 Wn.2d 252, 258, 438 P.3d 1174 (2019) ("[N]o restitution was imposed; . . . the trial court imposed only

three LFOS: the criminal filing fee, the DNA collection fee, and the crime victim [penalty] assessment [fee].").

Here, the trial court imposed a mandatory $500 crime victim penalty assessment. This is a nonrestitution LFO. *See Catling*, 193 Wn.2d at 258. The court included an interest provision that states, "The financial obligations imposed in this judgment shall bear interest from the date of the judgment until paid in full." CP at 473. The trial court improperly included this provision because it only imposed a nonrestitution LFO. Accordingly, we remand for the court to strike this provision from Dillingham Jenkins's judgment and sentence.

### III. STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Dillingham Jenkins raises two additional issues to challenge his conviction and sentence. Dillingham Jenkins argues that he received ineffective assistance of counsel and the prosecutor engaged in misconduct. We disagree.

A. SAG PRINCIPLES

A SAG must adequately inform the court of the nature and occurrence of alleged errors. *State v. Calvin,* 176 Wn. App. 1, 26, 316 P.3d 496 (2013); RAP 10.10. We consider only arguments not already adequately addressed as raised by the defendant's appellate counsel. *State v. Thompson,* 169 Wn. App. 436, 493, 290 P.3d 996 (2012). We do not review matters outside the record on direct appeal. *State v. McFarland,* 127 Wn.2d 322, 338, 899 P.2d 1251 (1995). Issues involving facts outside of the record are properly raised in a personal restraint petition, rather than a SAG. *Calvin,* 176 Wn. App. at 26. And we are "not obligated to search the record in support of claims made in a [SAG]." RAP 10.10(c).

B. INEFFECTIVE ASSISTANCE OF COUNSEL

Dillingham Jenkins claims that he received ineffective assistance of counsel because: "[n]o witnesses were subpoenaed, 911 tapes were not subpoenaed, [he has] prior mental health issues that were not addressed, [he has] also been acquitted by a jury for diminished capacity in the past and this was not investigated to be presented at trial by [his] attorney, [and] a professional defense witness was not solicited." SAG at 1. These issues all pertain to matters outside the record that we cannot address in direct appeal. *McFarland*, 127 Wn.2d at 338. Thus, we hold that his first SAG issue fails.

C. PROSECUTORIAL MISCONDUCT

Dillingham Jenkins next claims that the prosecutor engaged in misconduct because: "vindictive prosecution [and] discovery violations, [the] Paramedics never [e]ntered a report for [the] incident, [the] Prosecution [k]new of exculpatory evidence and[/]or information and did not act on it, [the] Prosecution waited nine [and] a half months before . . . recharging [because] they didn't have adequate evidence until they coached [the] firemen and paramedics." SAG at 1. Although RAP 10.10(c) does not require Dillingham Jenkins to refer to the record or cite authority, he is required to inform this court of the "nature and occurrence of [the] alleged errors." These assertions of error are too vague to allow us to identify the issues and we do not reach them.

CONCLUSION

We hold that the trial court did not err by denying Dillingham Jenkins's request to instruct the jury on voluntary intoxication, and any error in failing to give the instruction was harmless beyond a reasonable doubt. We also hold that the court did err by imposing an interest accrual provision regarding LFOs. Finally, we hold that Dillingham Jenkins raises no issues requiring

13

reversal in his SAG. Consequently, we affirm Dillingham Jenkins's conviction, but remand to the court to strike the interest accrual provision from his judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, C.J.

GLASGOW, J.