# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56006-2-II |
| Respondent, | |
| v. | |
| DAVID WILLIAM RICARDEZ, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — David W. Ricardez appeals his convictions for second degree assault, first degree burglary, possession of a stolen vehicle, second degree unlawful possession of a firearm, and third degree assault. Ricardez argues he received ineffective assistance of counsel when defense counsel failed to propose a jury instruction on voluntary intoxication. Because the evidence at trial did not support giving a jury instruction on voluntary intoxication, Ricardez did not receive ineffective assistance of counsel. Ricardez also argues that his judgment and sentence needs to be corrected. The State concedes that Ricardez's judgment and sentence needs to be corrected. In a Statement of Additional Grounds (SAG),[1] Ricardez argues the prosecutor committed misconduct. Because there was no prejudice from the prosecutor's comment, Ricardez's prosecutorial misconduct claim fails. Accordingly, we affirm Ricardez's convictions but remand to the trial court to correct Ricardez's judgment and sentence.

---

[1] RAP 10.10.

FACTS

A.   BACKGROUND INFORMATION

On October 29, 2020, Crystal Haggard observed a suspicious vehicle in a parking lot behind a fitness gym.  Haggard observed the female driver wipe down the vehicle with tissue and remove the front license plate from the vehicle.  Then the female and her male passenger, later identified as Ricardez, left the vehicle and walked down the alley.  Haggard called the police to report the suspicious activity.

Police were dispatched to the area to check on the suspicious vehicle.  The police learned that the vehicle was stolen.  The police photographed the vehicle and looked for any evidence or damage but left the vehicle parked in the parking lot because the owner did not want it towed.

After the police left, Todd Johannesen saw Ricardez approaching the vehicle.  Several people from the gym confronted Ricardez, and he began walking away.  Johannesen called 911 and attempted to keep Ricardez from leaving.

Ricardez got into the vehicle and drove away.  Johannesen was standing in front of the vehicle, so Ricardez made a sharp right turn out of the parking space, cut through the parking lot, and drove the wrong way down a one-way street.  Johannesen attempted to get out of the way of the vehicle but was hit by the front corner bumper of the vehicle.

Police officers responded to the area and attempted to locate the vehicle.  Ricardez abandoned the vehicle on the side of a street near a wooded area and ran through the wooded area up a hillside.

Douglas Higgins was preparing to leave his house when Ricardez came through his kitchen door.  Higgins told Ricardez to leave, but Ricardez grabbed Higgins's wrists.  Higgins pushed Ricardez away from him, and Ricardez attempted to open the refrigerator.  Ricardez told Higgins

2

he had recently been released from prison and then asked for a glass of water. Higgins gave Ricardez a glass of water, and Ricardez drank it.

While Ricardez was in Higgins' kitchen, Ricardez kept pulling a gun out of his back pocket. After seven or eight minutes, the police arrived at Higgins' house. Higgins heard the police outside the door and told them to come in. Ricardez then struck Higgins on the head with a gun multiple times. While Higgins was bent over and bleeding, Ricardez ran upstairs.

Police officers contacted Ricardez on the roof of Higgins' house. Police officers were able to communicate with Ricardez and, eventually, they were able to convince him to safely come down off the roof. Once Ricardez was off the roof, he was arrested.

The State charged Ricardez with two counts of second degree assault (count 1 involving David Higgins and count 5 involving Todd Johannesen), first degree burglary, possession of a stolen vehicle, and second degree unlawful possession of a firearm.[2] Prior to trial, the State amended the information to include firearm sentencing enhancements to the second degree assault charge in count 1 (Higgins) and first degree burglary.

B.      JURY TRIAL

At Ricardez's jury trial, Haggard, Johannesen, and Higgins testified to the facts above.

Before Higgins testified, there was a brief delay and the jury remained in the courtroom. While discussing the delay, the prosecutor noted that she was trying to prevent Higgins from having to wait when he arrived "as he is quite nervous." Verbatim Report of Proceedings (VRP) (June 16, 2021) at 66. The trial court immediately excused the jury and admonished the prosecutor

---

[2] The State also charged Ricardez with unlawful possession of a controlled substance—methamphetamine. Prior to trial, the trial court dismissed the unlawful possession of a controlled substance charge based on our Supreme Court's opinion in *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021).

for referencing Higgins' emotional state. The trial court stated the comment was harmless, but cautioned the prosecutor against making any further remarks. The trial court also offered to instruct the jury to disregard the prosecutor's comment. Ricardez's counsel declined the instruction, noting that it would likely unnecessarily emphasize the prosecutor's comment.

1.      Admissibility of Evidence of Drug Use

During the first day of the jury trial, Ricardez attempted to introduce evidence regarding his drug use on the day of his arrest. The State objected to introduction of evidence of drug use. The trial court held a hearing on the admissibility of Ricardez's drug use outside the presence of the jury.

Ricardez clarified that he did not intend to pursue diminished capacity as a defense but wanted to introduce evidence of voluntary intoxication in order to deny mens rea. Ricardez also provided an offer of proof where he testified that he had a chemical dependency to methamphetamine and opiates. He also testified that he was under the influence during the events that resulted in his arrest. He explained that he was scared, anxious, and confused about what was real. He clarified that he smoked in the vehicle when they first parked it in the parking lot and again right before he abandoned the vehicle on the side of the road. Based on the offer of proof, the trial court determined that Ricardez could present evidence of his drug use.

2.      Trial Testimony

Several police officers who had contact with Ricardez while he was on Higgins' roof testified. Sergeant Gary Sexton of the Aberdeen Police Department testified that he had a brief conversation with Ricardez before Ricardez came down from the roof. Sergeant Sexton stated that nothing about Ricardez's physical appearance stood out to him and he was able to engage Ricardez

in conversation. Sergeant Sexton believed that Ricardez understood what he was saying, and Ricardez seemed coherent in his responses.

Officer Brandi Slater of the Aberdeen Police Department testified that when she responded to Higgins' house, she observed Ricardez on the roof with a firearm. She and other officers gave Ricardez multiple commands to drop the firearm. Officer Slater then observed Ricardez throw the firearm into a neighbor's yard. After Ricardez threw the firearm, he attempted to get off the roof and had to be instructed to wait for the fire department to set up a ladder to safely get off the roof.

Officer Slater also testified that she had observed Ricardez on the roof for 20 to 30 minutes. During this time, Ricardez asked the police officers to shoot him multiple times. Ricardez also told the police officers several times that he was going to jump off the roof. Officer Slater observed that Ricardez was sweaty, seemed shaken up, and was clearly upset. Officer Slater testified that she did not recall Ricardez ever saying that he was delusional or high.

Detective Jason Perkinson of the Aberdeen Police Department responded to Higgins' house and contacted Ricardez on the roof. Initially, Detective Perkinson gave Ricardez commands to stay where he was and keep his hands visible. Ricardez obeyed all of Detective Perkinson's commands. Detective Perkinson described his communications with Ricardez:

> [Ricardez]—he was making a—some comments in our conversation that he didn't want to go back to prison, you should just shoot me. I tried to change the conversation, was I don't want to hurt you, we're trying to—you know, we don't need to make this any worse than—than it already is. The subject in the house, he's going to be okay. We don't have to—have to do anything else here. And then he was getting like he—he wanted, okay, I'm just—I'll give up and I'll come down. And he was like, I can just jump down. I can just jump down. No, we don't want you to jump down.

VRP (June 16, 2021) at 114-15. Detective Perkinson noted that, at one point, while lying on his chest, Ricardez seemed to have some trouble breathing, but when Detective Parkinson told

5

Ricardez to take the weight off his chest, Ricardez stopped gasping. Ricardez was sweating profusely throughout the time he was on the roof.

Detective Perkinson testified that when he first contacted Ricardez, Ricardez was pacing and excited, but his demeanor calmed, and then they were having a calm conversation. Throughout the conversation, Ricardez was speaking clearly. Detective Perkinson did not recall Ricardez saying he was delusional, out of his mind, or high.

Ricardez also testified at trial. Ricardez testified that he drove to Grays Harbor County with a female friend. They left the vehicle they drove in a parking lot and went to a house where his friend was staying. Ricardez was given keys to the vehicle and told to wait in the backyard. After waiting for a while, Ricardez went to a smoke shop to buy a methamphetamine pipe and a pack of cigarettes. Ricardez then used the pipe and returned to the vehicle. When he got to the vehicle, people began yelling at him and telling him they were calling the police. Ricardez was scared by a man yelling and approaching the vehicle, so he started the car and pulled out of the parking space. Ricardez stated that he was not trying to hit the man standing in front of the vehicle.

Ricardez pulled out of the parking lot without knowing where he was going. Ricardez explained he was in a panic due to his anxiety. After making several turns, Ricardez stopped the vehicle and used some more drugs. Ricardez explained he used methamphetamine because he was not in his right mind and was very tired so he was trying to wake up. He testified that he felt he "was getting right." VRP (June 16, 2021) at 190.

After Ricardez used more drugs, he heard sirens and tried to turn the car back on, but it would not start. He left the car and began running down the street. Ricardez testified that he was scared because random people were yelling at him and telling him the police were coming. He testified that he was "pretty high" and "freaked out." VRP (June 16, 2021) at 191. He continued

6

running through a wooded area and up a hill. When he got to the top of the hill he turned and saw a cop car down at the bottom of the hill. Seeing the cop car motivated Ricardez to "keep running, trying to find a place to hide." VRP (June 16, 2021) 193.

Even though Ricardez knew he could not legally have a firearm, Ricardez took a firearm from the floor of the vehicle because he decided "to collect everything I had on me that was illegal and just have it ready to ditch or hide." VRP (June 16, 2021) at 195. Ricardez had the firearm with him when he saw Higgins' open door, and he decided to run into the house to try to hide.

Ricardez testified that Higgins was there when he entered the house. Ricardez asked for a glass of water and then began talking to Higgins. Ricardez described the conversation:

> So [Higgins] poured me a cup of water. I was drinking it, right, and he was like, what's going on. And finally, like as I'm looking at him, like I'm speechless. I don't really have nothing really to say to him. I'm kind of like—just like—I'm freaking out. I hear—I hear like yelling outside like, he's in the house, just like that. And he goes, are the cops outside? Are the cops chasing you? And I was like, yes. Please, I can't—you know, I can't go back to jail. I'm scared. Like—you know what mean [sic]. Please let me hide. Please be quiet. Help me. You know what I mean. He's like, let's step outside and talk to them. Why don't we step outside and talk, you know. And I was like, I can't, you know. I just got out of prison and like—you know. The . . . I was like, I can't go back to jail. I can't go back to prison. Because I just got out and I just made contact with my daughter and I was talking about life things. He goes, it's okay. We can just go outside and talk and like—I don't know. Started—I don't know. I don't know, man. I was going through a lot. So I go to hand him back the cup of water and he's staring at me and he sets down the cup of water. And he's like, we need to go talk to them. And I was like—I kind of looked away and he grabbed me like he just—like he was going to citizen's arrest me or whatever. And I was like, let go of me. Like, get off me. And he's like, I got him. He's in here. And I was like, let go of me. I was trying to get him off of me. I couldn't get him off. So that's when I pulled a gun—I didn't point it at him. I never pointed at him. I just said, let go of me, and he wouldn't let go. I went full panic again and like—that's—that's when he got—that's when he got hit and I struck him.

7

VRP (June 16, 2021) at 196-97. Ricardez ran through the house continuing to try to get Higgins to let go of him. He finally got Higgins off, ran upstairs, and climbed out a bedroom window onto the roof.

When Ricardez saw the police, he immediately decided to throw the firearm off the roof because he did not think the police would talk to him if they saw he had a gun. He was terrified. Ricardez testified that, when he was on the roof, he felt like he was going to wake up from a dream and it could not be real. When asked why he asked the police officers to shoot him, Ricardez explained that he felt it would have been better than disappointing his family. Ricardez told the police officers he was dehydrated, delusional, and high. He also wanted to call his sister so he could tell her what happened "before [he] called her from a jail phone like [he] normally d[id]." VRP (June 16, 2021) at 201.

Ricardez testified that he never intended to harm Higgins and he did not intend to commit any crimes when he entered the house. He explained his only goal was to avoid going back to jail.

C.      JURY INSTRUCTIONS AND CLOSING ARGUMENTS

Before Ricardez testified, the State noted that jury instructions had already been submitted and Ricardez had not proposed any jury instructions on intoxication. The trial court remarked that it did not think a jury instruction was necessary because Ricardez was not arguing diminished capacity and he was only using intoxication to negate the specific intent element of the assault and burglary charges. However, the trial court stated that it would entertain any additional proposed jury instructions if they were offered.

After all testimony was completed, the trial court had a final discussion regarding jury instructions. Ricardez's defense counsel had no objections or exceptions to the State's proposed jury instruction. After a correction to remove the jury instruction stating that the defendant was

not required to testify, Ricardez's defense counsel agreed to the jury instructions. The jury instructions did not contain an instruction on voluntary intoxication.

During closing argument, Ricardez's defense counsel admitted that Ricardez assaulted Higgins but argued that the degree of the assault was the main dispute. Ricardez's counsel also admitted that Ricardez unlawfully entered or remained in Higgins' house and assaulted Higgins, but argued that Ricardez did not have an intent to commit a crime and, therefore, Ricardez was guilty only of trespass not burglary. And Ricardez's counsel argued that Ricardez did not intentionally strike Johannesen with the vehicle, but instead only accidentally hit Johannesen when Johannesen jumped in front of the vehicle while trying to stop Ricardez from leaving. Finally, Ricardez's defense counsel made a brief reference to intent and intoxication:

> Let's talk a little bit about intent. The reason why I want to talk about this is because Counts 1, 2 and 5, so the two assaults and the burglary in the first degree are what we call intent crimes, which means the person needs to try to do something. They didn't just do it by accident. You heard plenty of testimony that my client was under the intoxication of methamphetamines. Not just that, but that while on the roof he was pacing back and forth, he was having trouble breathing, he specifically asked officers to shoot him. He specifically told the officers that he wanted to jump off the roof. To any officers that said that these were appropriate answers or normal answers, that just cannot be the case. It is not normal to hear that someone is suicidal. It is not normal to be asked to be shot. It is clear, a mental health crisis. It is clear, a breakdown. The fact that my client was high can be easily seen by the fact that he had a brand-new used meth pipe, his own testimony. He wasn't proud to tell you that he was using drugs that day, that he was a drug addict. Nobody is.

VRP (June 16, 2021) at 301-02.

The jury found Ricardez guilty of second degree assault as charged in count 1, first degree burglary, possession of a stolen vehicle, second degree unlawful possession of a firearm, and third degree assault as a lesser included offense of count 5. The jury found that Ricardez was armed with a firearm during the commission of the second degree assault and first degree burglary.

Ricardez's offender score was over 9. The trial court imposed standard range sentences on all 5 counts: 84 months on count 1, 116 months on count 2, 57 months on count 3, 60 months on count 4, and 60 months on count 5. The firearm sentencing enhancement on count 1 was noted as 36 months and the firearm sentencing enhancement on count 2 was noted as 60 months. However, in the confinement section, the trial court noted that the term of confinement included 96 months for a firearm sentencing enhancement on count 2. The judgment and sentence also did not include a number designating the actual number of months of total confinement ordered. Finally, the trial court imposed 36 months of community custody on both counts 1 and 2.

Later, the trial court entered an order amending the judgment and sentence to reduce the amount of community custody and to clarify the imposition of the firearm sentencing enhancements. The term of community custody on counts 1 and 2 was reduced to 18 months. The trial court also ordered Ricardez to serve a total of 212 months of confinement, 96 months of which was due to firearm sentencing enhancements.

Ricardez appeals.

## ANALYSIS

A.    INEFFECTIVE ASSISTANCE OF COUNSEL

Ricardez argues that he received ineffective assistance of counsel because defense counsel failed to request a jury instruction on voluntary intoxication. We disagree.

We review claims of ineffective assistance of counsel de novo. *State v. Vazquez*, 198 Wn.2d 239, 249, 494 P.3d 424 (2021). To establish ineffective assistance of counsel, a defendant must show that their attorney's performance was deficient and prejudicial. *Id*. at 247-48. An ineffective assistance of counsel claim fails if the defendant fails to establish either deficient

performance or prejudice. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014).

There is a strong presumption that counsel is effective. *Vazquez*, 198 Wn.2d at 247. "The defendant has the burden to show that defense counsel's performance was deficient based on the trial court record." *Id*. at 248. "Specifically, 'the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Id*. at 248 (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)). The relevant question is whether defense counsel's strategic choices were reasonable. *Id*. at 255. Where the claim of ineffective assistance of counsel is based upon defense counsel's failure to request a particular jury instruction, the defendant must first show he was entitled to the instruction. *State v. Thompson*, 169 Wn. App. 436, 495, 290 P.3d 996 (2012), *review denied*, 176 Wn.2d 1023 (2013).

> RCW 9A.16.090 provides:
>
> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his or her intoxication may be taken into consideration in determining such mental state.

"A defendant is entitled to a voluntary intoxication instruction when (1) the crime charged includes a mental state, (2) there is substantial evidence of [intoxication], and (3) there is evidence that the [intoxication] affected the defendant's ability to form the requisite intent or mental state." *State v. Kruger*, 116 Wn. App. 685, 691, 67 P.3d 1147, *review denied*, 150 Wn.2d 1024 (2003). The evidence at trial "'must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged.'" *Id*. at 691-92 (quoting *State v. Gabryschak*, 83 Wn. App. 249, 252-53, 921 P.2d 549 (1996)).

The defendant must show more than he consumed alcohol or drugs; the defendant must establish the effect of the drugs or alcohol to establish the level of intoxication. *Id*. at 692. There must be substantial evidence of the level of intoxication through its effect on the defendant's body and mind. *See Id*. at 692 ("[T]here is ample evidence of his level of intoxication on both his mind and body, e.g., his 'blackout,' vomiting at the station, slurred speech, and imperviousness to pepper spray.").

Here, Ricardez established that he had used methamphetamine prior to and during the incident. Further, both second degree assault and burglary required intent. However, there was not substantial evidence that Ricardez's intoxication affected his ability to form intent. Despite stating that he was high and sleep-deprived, Ricardez clearly stated that he knew he had a firearm he was not supposed to have, he was running from police, and he was trying to hide from the police at the time he broke into Higgins' home. Further, all the police officers testified that they were able to communicate clearly with Ricardez when he was on the roof, he responded appropriately to questions and commands, and he was able to articulate requests such as wanting to talk to his sister. There was not substantial evidence establishing a reasonable and logical connection between Ricardez's level of intoxication and the inability to form intent.

Because there was not substantial evidence of the level of intoxication that would support giving an instruction on voluntary intoxication, Ricardez was not entitled to the voluntary intoxication instruction. Therefore, he cannot show that his defense counsel was deficient for failing to request a voluntary intoxication instruction, and his ineffective assistance of counsel claim fails.

B.      CORRECTION TO JUDGMENT AND SENTENCE

Ricardez argues that his judgment and sentence needs to be corrected because it identifies the incorrect term of the firearm sentencing enhancement on count 2 and the term of community custody exceeds the statutory maximum for count 1. The State concedes that the judgment and sentence needs to be corrected. We accept the State's concession and remand to the trial court to correct the errors in Ricardez's judgment and sentence.

First, second degree assault (count 1), carries a maximum term of 10 years or 120 months. RCW 9A.36.021(2)(a); RCW 9A.20.021(1)(b). The trial court imposed a base sentence of 84 months and a firearm sentencing enhancement of 36 months, which totals 120 months. Therefore, the imposition of 18 months for community custody on count 1 exceeds the statutory maximum for the crime. Ricardez's judgment and sentence should be corrected to reflect a term of zero months of community custody on count 1. *See State v. Boyd*, 174 Wn.2d 470, 473, 275 P.3d 321 (2012) (holding it is the trial court's responsibility to reduce the term of community custody to avoid a sentence that exceeds the statutory maximum).

Second, Ricardez's judgment and sentence states that a firearm sentencing enhancement of 96 months was imposed on count 2. Although the trial court did impose a total of 96 months for firearm sentencing enhancements on all counts, the term of confinement imposed for the firearm sentencing enhancement on count 1 was 36 months and on count 2 was 60 months. Thus, the judgment and sentence inaccurately reflects the trial court imposing 96 months for the firearm sentencing enhancement on count 2. Therefore, Ricardez's judgment and sentence should be corrected to accurately reflect the firearm sentencing enhancements imposed by the trial court.

C.    SAG

In his SAG, Ricardez claims that the prosecutor committed prosecutorial misconduct by referencing Higgins' nervousness in front of the jury. Because there was no prejudice from the prosecutor's comment, Ricardez's SAG claim fails.

To prevail on a claim of prosecutorial misconduct, Ricardez must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Misconduct is prejudicial if it had a substantial likelihood of affecting the verdict. *Id*. at 760. We review a trial court's decision on prejudice for an abuse of discretion, giving deference to the trial court's interpretation of the error. *State v. Borg*, 145 Wn.2d 329, 336, 36 P.3d 546 (2001).

Here, as the trial court recognized, the prosecutor's comment regarding Higgins' nervousness was improper. However, Ricardez admitted assaulting Higgins and breaking into his house. There is not a substantial likelihood that the prosecutor's isolated comment affected the verdict. Therefore, the trial court did not abuse its discretion in determining the prosecutor's conduct was harmless. Accordingly, Ricardez's prosecutorial misconduct claim fails.

We affirm Ricardez's convictions but remand to the trial court to correct the errors in Ricardez's judgment and sentence.

14

No. 56006-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, A.C.J.

Price, J.